IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHANNON MURPHY,                         )
                                        )
            Petitioner,                 )
                                        )
    v.                                  )    CASE NO. 2:07-cv-336-MEF
                                        )    (2:06-cr-122-MEF)
UNITED STATES OF AMERICA,               )
                                        )
            Respondent.                 )

## UNITED STATES' RESPONSE TO 28 U.S.C. § 2255 MOTION

COMES NOW the United States of America, by and through its attorney, Leura G. Canary,

United States Attorney, and, in compliance with this Court's order, responds to Petitioner Shannon

Murphy's Motion to Vacate, Set Aside, Or Correct Sentence By a Person In Federal Custody

Pursuant to 28 U.S.C. § 2255 (Doc. No. 1), as follows.

## I. PROCEDURAL HISTORY AND RELEVANT FACTS

On May 2, 2006, a grand jury for the Middle District of Alabama returned a five-count

indictment against Petitioner Shannon Murphy ("Murphy) and other named defendants.  (*See* Ex.

A, Indictment.)  Only Count 1 of the indictment alleges charges against Murphy, to wit: Count 1

charged that from an unknown date to on or about November, 2005, in the Middle District of

Alabama and elsewhere, Murphy and other named defendants,[1] did knowingly and willfully

combine, conspire, confederate and agree together and with other persons known and unknown to

the Grand Jury to knowingly and intentionally distribute and possess with intent to distribute

approximately 50 or more grams of methamphetamine; and more than 500 grams of a mixture and

substance containing a detectible amount of methamphetamine, Schedule II Controlled Substances,

---

[1] The other named defendants are Kendall R. Watson and Calvin Chance.  (*See id.*)

in violation of 21 U.S.C. §§ 841(a)(1) and 846.  (*See id.*)[2]

On September 6, 2006, Murphy entered into a Plea Agreement with the United States.  (*See* Ex. B, Plea Agreement.)  The Plea Agreement informed Murphy that, in return for pleading guilty to Count 1, the United States would: (1) file a three-level downward departure motion pursuant to U.S.S.G. §5K1.1; (2) recommend a three-level reduction for acceptance of responsibility; (3) not attribute more than 50 grams of methamphetamine to Murphy as relevant conduct; and (4) recommend a sentence at the low end of the applicable guideline range.  (*Id.* at 1-2.)  The United States noted that "in no event [should] the sentence exceed thirty-three (33) months." (*Id.*)  The Plea

---

[2]  The remaining four counts of the indictment are as follows:

Count 2 of the indictment charges that on or about October 19, 2005, in Deatsville, Alabama, Calvin Chance did possess with intent to distribute approximately 75 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

Count 3 of the indictment charges that on or before November 16, 2005, in Montgomery, Alabama, Kendall Watson did possess with intent to distribute 5 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

Count 4 of the indictment charges that on or before November 16, 2005, Kendall Watson did possess a Glock .45 caliber pistol whose serial number is unknown and obliterated during and in relation to a drug trafficking crime as set forth in Counts 1 and 3 of the indictment, in violation of 18 U.S.C. § 924(c)(1).

Count 5 of the indictment charges that on November 16, 2005, in Montgomery County, Alabama, Kendall Watson did possess a Glock .45 caliber pistol whose serial number is unknown and obliterated after having been convicted on or about April 27, 1999, in United States District Court for the Middle District of Alabama, of distribution of methamphetamine and January 16, 2004, in the Circuit Court of Butler County, Alabama, of unlawful possession of a controlled substance, in violation of 18 U.S.C. § 922(g)(1).

(*Id.*)

Agreement also provided that, absent circumstances involving prosecutorial misconduct or ineffective assistance of counsel, Murphy waived both her right to appeal her conviction or sentence, and her right to seek collateral relief under 28 U.S.C. § 2255. (*Id*. at 5-6.) The agreement concluded with Murphy's affirmance that she had read and understood the Plea Agreement. (*Id*. at 12.)

Murphy's guilty plea hearing was conducted on September 6, 2006, United States Magistrate Judge[3] Vanzetta Penn McPherson presiding. (*See* Ex. D, Plea Hr'g Tr.) Murphy was placed under oath. (*Id*. at 2.) Murphy informed the Court that she had received a copy of the indictment, reviewed the indictment with her attorney, and understood the charges in the indictment. (*Id*. at 4.) The Court advised Murphy that the maximum imprisonment penalty for Count 1 was not less than ten years, but not more than life. (*Id*.) Murphy stated that she understood the maximum imprisonment penalty. (*Id*.) Murphy then informed the Court that she was fully satisfied with the representation and advice given to her by her counsel. (*Id*.) Murphy also informed the Court that she had fully discussed the charges with counsel, that she had read and discussed the Plea Agreement with counsel before signing it, and that she understood the terms of the agreement. (*Id*. at 4-5.) Murphy acknowledged that the Plea Agreement is a reflection of the entire agreement she had with the United States and that no other assurances beyond the Plea Agreement were made to her about pleading guilty. (*Id*. at 5.)

The Court specifically asked Murphy if anyone said or did anything to force or coerce her to plead guilty and Murphy replied, "No." (*Id*. at 5-6.) The Court also specifically asked Murphy whether she understood that the Court could reject the United States' sentencing recommendation

---

[3] Murphy consented to have her plea taken by an United States Magistrate Judge. (*See* Ex. C.)

and impose a more severe sentence, but in that event, she would be permitted to withdraw her guilty plea. (*Id*. at 7.) Murphy stated that she understood those provisions. (*Id*.) The Court explained to Murphy that if she persisted in a guilty plea, she would forfeit valuable civil rights. (*Id*.) Specifically, the Court advised Murphy that, if once her plea was accepted, she may be deprived of the right to vote, the right to hold public office, the right to sit on a jury, and the right to carry a firearm. (*Id*.) Murphy acknowledged that she understood those conditions. (*Id*.)

Susan James ("James"), counsel to Murphy, then summarized the terms of the Plea Agreement, stating that, in return for Murphy's guilty plea, the United States would: (1) recommend a three-level downward departure pursuant to U.S.S.G. §5K1.1; (2) move for a three-level reduction for acceptance of responsibility; (3) agree not to attribute more than 50 grams of methamphetamine to Murphy as relevant conduct pursuant to U.S.S.G. §2D1.1; and (4) agree that in no event should the sentence exceed 33 months. (*Id*. at 8-9.) James also stated that the Plea Agreement included a standard cooperation agreement, including further cooperation being considered as the basis for a possible motion under Federal Rule of Criminal Procedure 35. (*Id*.) James further stated that, under the Plea Agreement, Murphy waived her right to appeal as well as collaterally attack the sentence with the exception of prosecutorial misconduct or ineffective assistance of counsel. (*Id*. at 9.)

The Court explained to Murphy that she had waived her right to appeal, but that the United States had not waived its right to appeal. (*Id*. at 11.) The Court clarified that if the United States filed an appeal, then Murphy could appeal. (*Id*.) The Court then explained to Murphy that if she persisted in a guilty plea, she would forfeit valuable civil rights. (*Id*.) Next, it explained to Murphy the constitutional rights she would forfeit if she entered a guilty plea in lieu of proceeding to trial. (*Id*.) Murphy then stated that she was pleading guilty to the offense charged against her. (*Id*. at 12.)

Murphy explained that she was involved with several different people in distributing and possessing with intent to distribute methamphetamine of more than 50 grams in the Middle District of Alabama. (*Id*. at 13.)   Murphy further stated that she conspired with numerous individuals to distribute methamphetamine.  (*Id*.)  After hearing Murphy plead guilty to Count 1, the Court stated that it found her to be competent and capable of entering an informed plea, and that each element of the offense was supported by an independent factual basis.  (*Id*. at 13-14.)  The Court then accepted Murphy's guilty plea.  (*Id*. at 14.)

A presentence investigation report ("PSI") was prepared by the United States Probation Office.  (*See* Case No. 2:06-cr-122-MEF, Doc. No. 130.)  The report related the factual circumstance of Murphy's offense such as her sale of approximately .5 grams of methamphetamine to a confidential source ("CS") working with the Autuga County Sheriff's Office.  (PSI at ¶ 8.)  A search warrant was executed on Murphy's residence and the police seized from her residence 8.78 grams of methamphetamine, digital scales, $636 in United States currency, a surveillance camera and monitor, a methamphetamine smoking pipe, and other drug paraphernalia.  (*Id*.)  Upon being placed under arrest for unlawful possession of a controlled substance, Murphy agreed to cooperate.  (*Id*.)  Murphy then advised police that she had used and sold methamphetamine for about two and a half years from her residence and she identified her source of supply.[4]  (*Id*.)  Murphy agreed to contact her source of supply for the investigators and arrange a methamphetamine purchase.  (*Id*.)  Murphy's contact with her source of supply and cooperation with law enforcement resulted in the additional counts of the indictment and prosecution of her co-defendants.  (*Id*. at 4.)

Based upon the pertinent facts of the offense and terms of the Plea Agreement, the probation

---

[4]  Murphy identified her source of supply as Calvin Chance.  (*Id*. at ¶ 8.)

officer calculated a base offense level of 26. (*Id*. at ¶ 15.) This base offense level was decreased by two levels pursuant to U.S.S.G. §2D1.1(b)(9) and an additional three levels pursuant to U.S.S.G. §§3E1.1(a) and (b), yielding a total offense level of 21. (*Id*. at ¶s 16, 21.) Murphy had no criminal history points. (*Id*. at ¶ 26.) Considering the total offense level of 21 and Murphy's criminal history category of I, the advisory guideline range of imprisonment was 37 to 46 months. (*Id*. at 40.)

On November 6, 2006, the United States filed a Motion for Downward Departure Pursuant to U.S.S.G. §5K1.1. (Ex. E.) By the motion, the United States requested a three-level downward departure for Murphy's substantial assistance and sought a sentence of 27 months of imprisonment. (*Id*.) Shortly thereafter, on November 15, 2006, Murphy filed a document stating her position on sentencing. (Ex. F.) In the sentencing statement, Murphy argued that her cooperation was more substantial than reflected in a three-level downward departure. (*Id*. at 3.) Murphy also argued that her medical condition of Attention Deficit Disorder and family situation warranted a further departure. (*Id*. at 7.) Murphy thus requested that the Court impose a sentence of 10 to 16 months allowing her to have intermittent confinement with drug treatment in the community. (*Id*.)

Murphy's sentencing hearing was conducted on November 21, 2006. (*See* Exhibit G, Sentencing Hr'g Tr.) The Court opened the hearing by discussing the terms of the Plea Agreement. (*Id*. at 2-3.) The United States advised the Court of the terms of the Plea Agreement, including Murphy's substantial assistance. (*Id*. at 3-4.) Murphy agreed with the United States' representations and requested the Court to adopt the Plea Agreement because "the plea agreement that was negotiated is appropriate." (*Id*. at 5.)

The Court adopted the Plea Agreement and granted the United States' motion for reduction of acceptance of responsibility under U.S.S.G. §3E1.1 (*Id*.) The Court then inquired as to Murphy's

objections to the PSI and Murphy responded that she had no objections.  (*Id*. at 6.)  Considering the absence of objections to the PSI, the Court adopted the factual statements in the PSI.  (*Id*.)  The Court further found that Murphy's offense level was 21, her criminal history category is I, and the advisory guideline range of imprisonment was 37 to 46 months.  (*Id*.)  The Court then granted the United States' motion for downward departure for substantial assistance, yielding a final offense level of 18, which, when combined with a criminal history category of I, resulted in an advisory guideline imprisonment range of 27 to 33 months.  (*Id*. at 6-7.)  The Court then heard testimony from three witnesses on Murphy's behalf in mitigation.[5]  (*Id*.)  Having heard the mitigating testimony, the Court, pursuant to U.S.S.G. §5K2.0, further reduced Murphy's offense level to 17.  (*Id*. at 32.)  This reduced offense level of 17 combined with criminal history category I resulted in an advisory guideline range of 24 to 30 months.  (*Id*. at 32-33.)  The Court then sentenced Murphy to 24 months and recommended that she be designated to a facility where intensive residential substance abuse treatment is available.  (*Id*. at 36.)  Judgment was entered in Murphy's case on December 1, 2006. (Ex. H.)

Murphy filed this Motion to Vacate, Set Aside or Correct Sentence on April 19, 2007.  (Doc. No. 1.)  On May 15, 2007, this Court entered an order directing the United States to respond to Murphy's claims no later than June 14, 2007.  (Doc. No. 3.)  The United States now files this response to the § 2255 motion.

## II.  CLAIM RAISED IN THE § 2255 MOTION

Murphy challenges her sentence on the basis that she was denied entry into the Federal Bureau of Prison's ("FBOP") intensive residential substance abuse treatment program ("Treatment

---

[5]  These three witnesses were Daniel L. Kock, M.D., Emmet Silas, and Vicky Silas.

Program"). Murphy complains that the Court's sentence was based on inaccurate information as the Court was under the impression that the least sentence that could be imposed to allow her to participate in the FBOP's Treatment Program was 24 months. Murphy asserts that the Court's intentions at sentencing were to sentence her to 24 months so that she could receive admittance into the Treatment Program and then benefit from the 12-month reduction for completion of the program. Murphy contends that the Court's intentions at sentencing have been frustrated and asserts that her sentence should be vacated.

### III.  RESPONSE TO CLAIM FOR RELIEF

**A.**    **Statute Of Limitations Poses No Bar to Murphy's § 2255 Petition**

At the outset, the United States notes that Murphy has filed her motion in a timely manner under paragraph six of 28 U.S.C. § 2255, which provides a one-year period of time within which to file a motion under the rule. The applicable provision in this case requires that a movant file her § 2255 motion within one year from "the date on which the judgment of conviction became final."

The judgment against Murphy was entered on December 1, 2006. (Ex. H.) She did not appeal her conviction or sentence to the Eleventh Circuit Court of Appeals, thus her sentence became final when the time for filing an appeal to the Eleventh Circuit expired. *See Kaufman v. United States,* 282 F.3d 1336, 1337-39 (11th Cir. 2002) (holding that a judgment of conviction becomes final for someone who appeals to an appellate court when the time for seeking certiorari review in the Supreme Court expires). Because Murphy had ten days from the December 1, 2006, entry of judgment by this Court to seek review by the Eleventh Circuit;[6] her judgment of sentence became

---

[6]  *See* Fed. R. App. P. 4(b).

8

final on December 15, 2006. Therefore, under § 2255, Murphy had until December 15, 2007, to file her motion. The filing of Murphy's § 2255 motion on April 19, 2007, is well within one year of December 16, 2006, and her motion is therefore timely.

**B.**     **Waiver of Appeal and Collateral Attack Bars Murphy's § 2255 Petition**

The United States submits that Murphy's claim raised in her § 2255 petition is due to be denied because she waived her right to directly or collaterally attack her sentence. The right to appeal is statutory and can be waived knowingly and voluntarily. *United States v. Bushert*, 997 F.2d 1343, 1350 (11th Cir. 1993); *see also United States v. Buchanan*, 131 F.3d 1005, 1008 (11th Cir. 1997). For an appellate waiver to be enforced, the United States must demonstrate either that this Court specifically questioned Murphy concerning the sentence-appeal waiver during the Federal Rule of Criminal Procedure 11 colloquy or that it is manifestly clear from the record that Murphy otherwise understood the full significance of the waiver. *Bushert*, 997 F.2d at 1351. The critical inquiry is not the extent to which the district court reviewed the sentence-appeal waiver but the extent to which the record demonstrates the defendant's knowledge and understanding of the waiver. *See id*. (defendant's knowledge and understanding of the waiver are among the components that constitute the core concerns of the defendant's right to be aware of the direct consequences of his guilty plea). The Eleventh Circuit has held that a valid sentence-appeal waiver precludes a defendant's § 2255 claims. *See Williams v. United States*, 396 F.3d 1340, 1342 (11th Cir. 2005) (barring § 2255 claims based on ineffective assistance of counsel at sentencing).

Here, the Court specifically questioned Murphy concerning the sentence-appeal waiver during the Rule 11 colloquy, and Murphy's response to the Court's inquiry demonstrate that she understood the appeal waiver. (Ex. D at 11.) Murphy agreed to waive her right to seek relief

9

pursuant to 28 U.S.C. § 2255 when she agreed to plead guilty in the September 6, 2006, Plea Agreement and guilty plea hearing. (*See* Ex. B at 5-6; Ex. D at 9.) James, Murphy's counsel, recited the terms of the Plea Agreement, specifically stating that Murphy waived her right to appeal and her ability to collaterally attack her sentence. (Ex. D at 9.) The waiver was limited, and not applicable to instances of prosecutorial misconduct or ineffective assistance of counsel.[7] (*Id*. at 9.) Further, the Court specifically questioned Murphy as to whether she understood the terms of her Plea Agreement, and Murphy stated under oath that she did. (*Id*. at 5.) Murphy also stated that she was not forced or coerced into pleading guilty. (*Id*. at 5-6.) Hence, the United States submits that Murphy's sentence-appeal waiver is due to be enforced because the record shows that she knowingly and voluntarily waived her right to directly or collaterally attack her sentence. For this Court to entertain the issues that Murphy now raises in this collateral proceeding would be to permit Murphy an appeal in contravention of the plain meaning of her plea agreement and to deny the United States the benefit for which it bargained. *See Buchanan*, 131 F.3d at 1008; *also United States v. Wenger*, 58 F.3d 280, 282 (7th Cir. 1995) (defendant "exchanged his right to appeal for prosecutorial concessions; he cannot have his cake and eat it too"). This Court should not permit such action. Rather, this Court should find that the sentence-appeal waiver precludes Murphy from raising the issue she asserts in her § 2255 motion.

Accordingly, dismissal of Murphy's § 2255 motion at the earliest stage in the process is warranted. *See Buchanan*, 131 F.3d at 1008 ("where it is clear from the plea agreement and the Rule 11 colloquy . . . that the defendant knowingly and voluntarily entered into a sentence appeal waiver,

---

[7] Notably, Murphy's denial of admission to the drug treatment claim does not fall within the limited exceptions to the appeal waiver.

that waiver should be enforced without requiring the Government to brief the merits of the appeal"). Because Murphy knowingly and voluntarily waived her right to directly or collaterally attack her sentence as a condition of the Plea Agreement, her § 2255 motion is due to be dismissed. *See Leach v. United States*, 171 Fed. Appx. 765 (11th Cir. 2006) (unpublished) (finding express language of appeal waiver contained in plea agreement precluded defendant from collaterally attacking his sentence ). Therefore, this Court should conclude that Murphy's § 2255 claim is barred by her sentence-appeal waiver.

## V. CONCLUSION

For the above reasons, Petitioner Shannon Murphy has failed to demonstrate that she is entitled to any immediate relief from this Court and her § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted this 14th day of June, 2007.

/s/ Jerusha T. Adams
JERUSHA T. Adams
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
jerusha.adams@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHANNON MURPHY,                     )
                                    )
            Petitioner,             )
                                    )
    v.                              )       CASE NO. 2:07-cv-336-MEF
                                    )       (2:06-cr-122-MEF)
UNITED STATES OF AMERICA,           )
                                    )
            Respondent.             )

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participant: Susan G. James.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Jerusha T. Adams
JERUSHA T. Adams
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
jerusha.adams@usdoj.gov

**FILED**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MAY - 2 2006

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. **2:06cr122-MEF** |
| | ) | [18 USC 922(g)(1); |
| KENDALL R. WATSON, | ) | 18 USC 924(c)(1); |
| CALVIN CHANCE, and | ) | 21 USC 846; |
| SHANNON S. MURPHY | ) | 21 USC 841(a)(1)] |
| | ) | |
| | ) | **INDICTMENT** |
| | ) | |

The Grand Jury charges:

## COUNT 1

From an unknown date to on or about November, 2005, in the Middle District of

Alabama, and elsewhere,

**KENDALL R. WATSON,**
**CALVIN CHANCE, and**
**SHANNON S. MURPHY,**

defendants herein, did knowingly and willfully combine, conspire, confederate and agree

together and with other persons known and unknown to the Grand Jury to knowingly and

intentionally distribute and possess with intent to distribute approximately 50 or more

grams of methamphetamine; and more than 500 grams of a mixture and substance

containing a detectible amount of methamphetamine, Schedule II Controlled Substances,

in violation of Title 21, United States Code, Section 841(a)(1). All in violation of Title 21,

United States Code, Section 846.

## COUNT 2

On or about October 19, 2005, the exact date being unknown to the Grand Jury, in

Deatsville, Alabama, in the Middle District of Alabama, and elsewhere,

**CALVIN CHANCE,**



GOVERNMENT
EXHIBIT

A

defendant herein, and others both known and unknown to the grand jury, did knowingly and intentionally possess and possess with intent to distribute approximately 75 grams of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 3

On or about November 16, 2005, the exact date being unknown to the Grand Jury, in Montgomery, Alabama, in the Middle District of Alabama, and elsewhere,

### KENDALL R. WATSON,

defendant herein, and others both known and unknown to the grand jury, did knowingly and intentionally possess and possess with intent to distribute approximately 5 grams of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 4

On or about November 16, 2005, in Montgomery County, Alabama, in the Middle District of Alabama,

### KENDALL R. WATSON,

defendant herein, did knowingly use and carry during and in relation to, and did knowingly possess in furtherance of a drug trafficking crime as set forth in Counts 1 and 3 above, which allegations the Grand Jury reallege and incorporate by reference herein, for which the defendant may be prosecuted in a Court of the United States, a firearm, namely, a Glock, .45 caliber pistol whose serial number is unknown and obliterated. All in violation of Title 18, United States Code, Section 924(c)(1).

## COUNT 5

On or about November 16, 2005, in Montgomery County, Alabama, in the Middle

2

District of Alabama,

### KENDALL R. WATSON,

defendant herein, having been convicted on or about April 27, 1999, in the United States

District Court for the Middle District of Alabama of Distribution of Methamphetamine and

January 16, 2004, in the Circuit Court of Butler County, Alabama, of unlawful possession

of a controlled substance, a crime punishable by imprisonment for a term exceeding one

year under the laws of the State of Alabama, knowingly did possess in and affecting

commerce, a Glock .45 caliber pistol whose serial number is unknown and obliterated, in

violation of Title 18, United States Code, Section 922(g)(1).

A TRUE BILL:

_Jaynne D Dulbert_
Foreperson

_Leura G. Canary_
Leura G. Canary
United States Attorney

_Todd A. Brown_
Todd A. Brown
Assistant United States Attorney

3

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
          v.                      )     CR. NO.  2:06-cr-122-MEF
                                  )
SHANNON S.  MURPHY                )

## PLEA AGREEMENT

DEFENSE COUNSEL:              SUSAN G. JAMES

ASSISTANT U.S. ATTORNEY:     TERRY F. MOORER

COUNTS AND STATUTES CHARGED:

Count 1:          21 U.S.C. § 846
                  Conspiracy to possess with intent to distribute narcotics

COUNTS PLEADING PURSUANT TO PLEA AGREEMENT:

Count 1:          21 U.S.C. § 846

MAXIMUM PENALTY:

21 U.S.C. § 846      Conspiracy to posses with intent to distribute methamphetamine

Sentence: A  term of imprisonment which may not be less than 10 years, not more than
life imprisonment; a fine of not more than $4,000,000, or both; a term of supervised release
of not more than 5 years; and an assessment fee of $100.

ELEMENTS OF THE OFFENSE

Count 1          21 U.S.C. § 846

        1.  That two or more persons in some way or manner, came to a mutual
        understanding to try to accomplish a common and unlawful plan, as charged
        in the indictment, to wit: to distribute and possess with intent to distribute
        methamphetamine; and

        2.  That the defendant, knowing the unlawful purpose of the plan, willfully
        joined in it.



GOVERNMENT
EXHIBIT

B

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Terry F. Moorer, Assistant United States Attorney, and Susan G. James, Esquire, attorney for the defendant, pursuant to Rule 11(c)(1)(C) Federal Rules of Criminal Procedure, as amended, have, with the authorization of the undersigned defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the Indictment herein and a Plea Agreement has been reached by said parties.

### GOVERNMENT'S PROVISIONS

1. Upon entering a plea of guilty by the defendant to the offense charged in Count 1 of the Indictment, the attorney for the Government will do the following:

a. The Government agrees to file a three level downward departure pursuant to U.S.S.G. § 5K1.1 and to recommend the low end of the resulting guideline sentencing range.

b. The Government will agree that the defendant receive a 3-level reduction in the applicable offense level pursuant to U.S.S.G. § 3E1.1(a) for the defendant's acceptance of responsibility is appropriate so long as the defendant does not obstruct justice or otherwise fail to accept responsibility for the offense conduct.

c.    The Government will not attribute more than 50 grams of methamphetamine to the defendant as relevant conduct under U.S.S.G § 2D1.1. In no event shall the sentence exceed thirty-three (33) months.

In exchange for her cooperation in future cases, the defendant shall receive a downward departure motion under the provisions of Rule 35, Federal Rules of Criminal Procedure. The defendant understands and agrees that the United States Attorney for the

2

Middle District of Alabama shall have the sole discretion to determine whether and to what extent if any to file such motion for downward departure.

### DEFENDANT'S PROVISIONS

1. The defendant agrees to the following:

    a.  To plead guilty to Count 1 of the Indictment.

    b.   Not to commit any other federal, state, or local offense while awaiting sentencing, whether that offense is charged, or is chargeable, or not.  Such criminal activity would include, but is not limited to, any attempt to continue Defendant's drug dealing operations, witness tampering, or facilitation of any other criminal activity.  Determination of whether Defendant's conduct is a violation of this provision is at the complete discretion of the Government.

    c.   Comply with the Cooperation Agreement as set forth below.

### FACTUAL BASIS

The defendant admits the allegations charged in the Indictment and understands that the nature of the charge to which the plea is offered involves proof as to the charges in the Indictment.  Specifically, the defendant admits the following to be true and correct: Until on or about November, 2005, the defendant had an understanding with other persons known and unknown to distribute and possess with intent to distribute methamphetamine. After entering the agreement, the defendant did distribute more than 50 grams of methamphetamine in the Middle District of Alabama.

3

## COOPERATION AGREEMENT

The defendant agrees to cooperate fully and testify truthfully against any and all persons as to whom the defendant may have knowledge at the grand jury, trial, or whenever called upon to do so. The defendant understands that this agreement requires the defendant to be truthful and to testify truthfully whenever called upon. The defendant agrees to be available for the review of documents and other materials and for interviews by law enforcement officers and attorneys for the Government upon reasonable request and to fully and truthfully respond to all questions asked of the defendant by law enforcement officers and attorneys for the Government.

The defendant agrees to fully and truthfully disclose to the Government everything the defendant knows about any and all documents and materials in the defendant's possession that relate to the violations charged in this Indictment and any other criminal violations in the Middle District of Alabama and elsewhere. The defendant agrees, if desired by the Government, to travel with agents outside the Middle District of Alabama to identify others involved in Defendant's narcotics organization, locations and/or residences of others involved, or any other information related to others involved in this narcotics trafficking activity. The defendant agrees to submit to a polygraph examination conducted by the Government if requested to do so.

Provided that the defendant satisfies the terms of this Plea Agreement, any information that the defendant truthfully discloses to the Government during the course of the defendant's cooperation, concerning related offenses, will not be used against the defendant, directly or indirectly. The defendant understands that this agreement does not

4

bar the defendant's prosecution for capital felonies, perjury, false statements, and/or obstruction of justice.

If the defendant has failed or should fail in any way to fulfill completely the defendant's obligations under this agreement, then the Government will be released from its commitment to honor all of its obligations to the defendant, without the defendant being allowed to withdraw the guilty plea. Thus, if at any time the defendant should knowingly and willfully withhold evidence from, or is found to have provided false information to, the Government investigators or attorneys prior to or during the defendant's testimony before grand juries or in trials, or fails to return to the Middle District of Alabama for any scheduled court appearance or any scheduled meeting with law enforcement agents in the Middle District of Alabama, then the Government will be free: (1) to prosecute the defendant for perjury, false declaration, false statement, and/or obstruction of justice (18 U.S.C. §§ 1621, 1623, 1001, 1503); (2) to prosecute the defendant for all violations of federal criminal law which the defendant has committed; (3) to use against the defendant in all of those prosecutions and sentencings the information and documents that the defendant has disclosed or furnished to the Government during the course of the defendant's cooperation; (4) to recommend a maximum sentence; and, (5) to seek forfeiture of any and all forfeitable properties of the defendant. The question of whether the defendant has breached this agreement shall be at the sole discretion of the Government.

### DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

Understanding that 18 U.S.C. § 3742 provides for appeal by a defendant of the sentence under certain circumstances, the defendant expressly waives any and all rights

conferred by 18 U.S.C. § 3742 to appeal the sentence. Defendant further expressly waives the right to appeal the conviction and sentence on any other ground and waives the right to attack the sentence in any post-conviction proceeding. This waiver does not include the right to appeal on the grounds of ineffective assistance of counsel and prosecutorial misconduct.

Notwithstanding the above, the defendant reserves the right to file a direct appeal of an upward departure from the applicable Guidelines range which the sentencing court specifies at the time of sentencing as having been imposed pursuant to either U.S.S.G. § 4A1.3 (from criminal history category) or § 5K2.O (from offense level). The defendant understands and agrees that this waiver as to all other Guidelines findings would still be in force and effect notwithstanding the appealability of an upward departure.

Further, the defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum set for the offense and pursuant to the sentencing guidelines and expressly waives the right to appeal defendant's sentence, directly or collaterally, on the ground that the sentencing guidelines are in any respect unconstitutional, on the grounds that any fact found by the Court for sentencing was not alleged in the Indictment, admitted by the Defendant, found by a jury, or found beyond a reasonable doubt, and on any other ground, including the applicability of the "safety valve" provisions contained in 18 U.S.C. §3553(f) and USSG § 5C1.2, except for an upward departure by the sentencing judge, a sentence above the statutory maximum, or a sentence in violation of the other law apart from the sentencing guidelines; provided, however, that if the government exercises its right to appeal the sentence imposed, as

6

authorized by 18 U.S.C. § 3742, then except for the waiver of appeal on the ground that

the sentencing guidelines are in any respect unconstitutional and on the grounds that any

fact found by the Court for sentencing was not alleged in the Indictment, admitted by the

defendant, found by a jury, or found beyond a reasonable doubt, the waiver of which will

remain in force, the defendant is released from this waiver and may appeal the sentence

as authorized by 18 U.S.C. § 3742(a).

In return for the above waiver by the defendant, the Government does not waive its

right to appeal the sentence imposed in the instant case. The Government does not waive

its right to appeal any order dismissing the Indictment, vacating a sentence, or otherwise

terminating the prosecution at any stage of the proceedings. Further, the parties agree that

nothing in this agreement shall affect the Government's right and/or duty to appeal as set

forth in 18 U.S.C. § 3742(b).

<u>DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT</u>

1. The defendant, before entering a plea of guilty to the Indictment, as provided for

herein by said Plea Agreement, advises the Court that:

a. The discussions between the attorney for the Government and the attorney

for the defendant towards reaching an agreed plea in this case have taken place with the

defendant's authorization and consent.

b. The defendant further understands that, pursuant to 18 U.S.C. § 3013,

said $100.00 assessment fee for each charge is to be paid by the defendant on the date

of sentencing and that, if a fine is imposed by the Court at sentencing, the defendant shall

meet with a member of the Financial Litigation Section of the United States Attorney's

Office on the day of sentencing and complete a written personal financial statement setting

forth the defendant's assets and liabilities as of the date of the offense.  The defendant will

make an honest, good faith effort to pay said fine as directed by the Financial Litigation

Section of the United States Attorney's Office.  The defendant further understands that by

completing the financial statement, the defendant is representing that it is true and

accurate to the best of the defendant's information, knowledge, and belief.

   c.  The defendant understands that the defendant has a right to be

represented by an attorney at every stage of the proceedings against the defendant herein

and is represented by the defendant's undersigned attorney.

   d. The defendant understands that the defendant has the right to plead not

guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the

assistance of counsel, the right to confront and cross-examine witnesses against the

defendant, the right to call witnesses in the defendant's own behalf, and the right not to be

compelled to incriminate the defendant, and that if the defendant enters a plea of guilty

herein, there will not be a further trial of any kind and that by the entry of such a plea, the

defendant waives the right to a trial by jury or to a trial before the Court.

   e. The defendant further understands that in entering a plea of guilty herein,

the Court may ask questions about the offense to which the plea is entered and further

understands that if the defendant answers these questions under oath, on the record, and

in the presence of counsel, which questions and answers would be recorded, that the

answers may later be used against the defendant in a prosecution for perjury or false

statement if the answers are not truthful.

8

f. The defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge, and consent.

g. The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

h. The defendant further understands that the Government can only make a recommendation, which is not binding upon the Court. However, if the Court does not accept the Plea Agreement, the defendant may withdraw her guilty plea, if she so chooses.

i. The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant. However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

9

j. The defendant further understands that if the defendant has failed or should fail in any way to fulfill completely the defendant's obligations under this agreement, including, but not limited to, committing any new state or federal criminal offense while awaiting sentencing, then the Government will be released from its commitment to honor all of its obligations to the defendant without the defendant being able to withdraw her guilty plea. The determination of whether the defendant has breached this plea agreement by failing to fulfill the defendant's obligations herein, will be at the sole discretion of the Government.

k. The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

2. The undersigned attorneys for the Government and for the defendant represent to the court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, as Amended. The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further, the defendant has been advised that if the

10

defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

3.    The defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history. The offense level or criminal history category, as calculated by the Probation Officer and determined by the court, may differ from that projected by defendant's counsel or the U.S. Attorney.

This _____ day of September, 2006.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

Terry F. Moorer
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 197
Montgomery, Alabama 36101-0197
Phone: 334-223-7280
Fax: 334-223-7135

Louis V. Franklin, Sr.
Chief / Criminal Division

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.

SHANNON S. MURPHY
Defendant

September 6, 2006
Date

SUSAN G. JAMES
Attorney for the Defendant

September 6, 2006
Date

12

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
    )
v.    )    2:06cr122-MEF
    )
SHANNON S. MURPHY

## CONSENT

I hereby declare my intention to enter a plea of guilty in the above case, and I

consent to have a United States Magistrate Judge conduct the proceedings required

by Rule 11 of the Federal Rules of Criminal Procedure incident to the making of such

a plea.  I understand that if my plea of guilty is then accepted by the District Judge,

the District Judge will decide whether to accept or reject any plea agreement I may

have with the United States, and will adjudicate guilt and impose sentence.

DATED this 6th day of September 2006

_____
DEFENDANT

_____
COUNSEL

GOVERNMENT
EXHIBIT

C

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5   UNITED STATES OF AMERICA

6       vs.                        CR NO:   06cr122-MEF

7   SHANNON S. MURPHY

8

9

10             *  *  *  *  *  *  *  *  *  *  *

11              CHANGE OF PLEA HEARING

12             *  *  *  *  *  *  *  *  *  *

13       Before the Honorable Vanzetta Penn McPherson,

14           United States Magistrate Judge, at

15        Montgomery, Alabama, on September 6, 2006

16             *  *  *  *  *  *  *  *  *  *

17

18

19   APPEARANCES:

20   FOR THE GOVERNMENT:    Terry F. Moorer
                            Assistant United States Attorney
21
     FOR THE DEFENDANT:     Susan Graham James,
22                          Attorney at Law

23

24                                     GOVERNMENT
                                       EXHIBIT
25                                        D

2

1          (The above case coming on for hearing at

2      Montgomery, Alabama, on September 6, 2006, before the

3      Honorable Vanzetta Penn McPherson, United States

4      Magistrate Judge, the following proceedings were had

5      commencing at 9:00 a.m.:)

6          THE COURT:  United States of America versus

7  Shannon S. Murphy, Case Number 06-122.  The Defendant

8  appears for entry of a guilty plea with her attorney,

9  Ms. Susan James.  Appearing for the government is

10  Mr. Terry Moorer.  Also present in the courtroom is Mr. Al

11  Lancaster from the United States Probation Office.  Please

12  swear the Defendant.

13          THE CLERK:  Do you solemnly swear or affirm that

14  the testimony you are about to give in this cause is the

15  truth, the whole truth, and nothing but the truth, so help

16  you God?

17          THE DEFENDANT:  I do.

18          THE COURT:  Ms. Murphy, please state your full

19  name.

20          THE DEFENDANT:  Shannon Silas Murphy.

21          THE COURT:  How old are you?

22          THE DEFENDANT:  30.

23          THE COURT:  How far did you go in school?

24          THE DEFENDANT:  I graduated, 12th.  12th grade.

25          THE COURT:  Have you ever been treated for mental

3

1  illness or addiction to narcotic drugs?

2        THE DEFENDANT:  I am presently under the care of

3  Dr. Daniel Cook.

4        THE COURT:  For what condition?

5        THE DEFENDANT:  Attention deficit disorder and

6  substance abuse.

7        THE COURT:  Are you consuming any medication as

8  part of that treatment?

9        THE DEFENDANT:  Yes, ma'am.  Prozac.

10        THE COURT:  How often do you take that

11  medication?

12        THE DEFENDANT:  Every morning.

13        THE COURT:  Did you take it this morning?

14        THE DEFENDANT:  Yes, ma'am.

15        THE COURT:  Is there any other drug or alcoholic

16  beverage in your system now?

17        THE DEFENDANT:  No, ma'am.

18        THE COURT:  Have you consumed any other drugs or

19  alcohol within the last 48 hours?

20        THE DEFENDANT:  No, ma'am.

21        THE COURT:  Does your consumption of the drug

22  Prozac affect in any way your ability to understand these

23  proceedings?

24        THE DEFENDANT:  No, ma'am.

25        THE COURT:  Does it affect in any way your

4

1  ability to understand the advice given to you by counsel

2  or the advisories that will be given to you in court this

3  morning?

4          THE DEFENDANT:  No, ma'am.

5          THE COURT:  Have you received a copy of the

6  indictment in this case?  Have you reviewed it with your

7  attorney and do you understand the charges?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  According to your plea agreement you

10  are entering a plea to count one, namely, conspiracy to

11  possess with intent to distribute methamphetamine.  The

12  maximum penalty that can be imposed upon you is not less

13  than ten years, not more than life, a fine of not more

14  than four million dollars, a term of supervised release of

15  not more than five years, and a mandatory assessment fee

16  of one hundred dollars.  Do you understand that maximum

17  penalty?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Are you fully satisfied with the

20  representation and advice given to you by Ms. James?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  Is your willingness to plead guilty

23  the result of discussions or conversations that Ms. James

24  has had with Mr. Moorer?

25          THE DEFENDANT:  Yes, ma'am.

5

1        THE COURT:  When she talked with him to negotiate

2   a plea in your case, did she do so with your knowledge and

3   consent?

4        THE DEFENDANT:  Yes, ma'am.

5        THE COURT:  Have you read and reviewed with your

6   lawyer the plea agreement in this case?

7        THE DEFENDANT:  Yes, ma'am.

8        THE COURT:  Do you understand all of its terms?

9        THE DEFENDANT:  Yes, ma'am.

10        THE COURT:  Is the agreement that the Court

11   currently has a reflection of the entire agreement that

12   you have with the government?

13        THE DEFENDANT:  Yes, ma'am.

14        THE COURT:  Has anyone said or done anything to

15   give you assurances about what will happen to you if you

16   plead guilty other than the terms of the plea agreement?

17        THE DEFENDANT:  Yes, ma'am -- no.  No.  I don't

18   understand that, really.

19        THE COURT:  All right.  Other than what's in the

20   plea agreement, has anyone said anything to make any

21   guarantees or assurances to you about what will happen to

22   you if you plead guilty?

23        THE DEFENDANT:  No, ma'am.

24        THE COURT:  Has anyone said or done anything to

25   force or coerce you to plead guilty?

1          THE DEFENDANT:  No, ma'am.

2          THE COURT:  Ms. Murphy, it's very important

3    during the course of this proceeding if I ask a question

4    that you do not understand for you to stop and say you do

5    not understand.

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  It's perfectly okay if you don't.

8    The Court will take the time to explain to make sure that

9    you do.

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  Because your responses on the record

12    are meaningful.  They are meaningful today and they will

13    be meaningful in the future.  So we don't want to

14    attribute to you any understanding that you don't have.

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  The plea agreement, as I'm sure you

17    know, has in it certain recommendations.  You are entering

18    a plea pursuant to Rule 11(c)(1)(C).  The government has

19    agreed to make certain recommendations to the Court about

20    your sentence, and you in turn have agreed to certain

21    conditions.  You understand that; correct?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  What I want you to understand now is

24    that even though you and the government have entered a

25    plea agreement, it is not binding on the Court.  The

7

1  agreement itself is merely a recommendation to the Court

2  that the Court is not bound to follow.  Do you understand?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Because you are entering your plea

5  pursuant to Rule 11(c)(1)(C), if the Court rejects the

6  plea agreement and sentences you to a term of imprisonment

7  harsher than the one contemplated in the agreement, you

8  may withdraw your plea.  Do you understand?

9          THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  However, you may not simply change

11  your mind and decide you don't want to enter a plea of

12  guilty anymore.  Do you understand that?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  The offense to which you are

15  pleading, namely, conspiracy, is a felony offense,

16  Ms. Murphy.  Once your plea is accepted you may be

17  deprived of the right to vote, the right to hold public

18  office, the right to sit on a jury, and the right to carry

19  a firearm.  Do you understand that?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  Upon your conviction of this offense

22  it will be a separate federal offense for you even to

23  possess a weapon, whether you use it or point it at anyone

24  or not.  Do you understand that?

25          THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Do you also understand that if you

2    are sentenced to a term of imprisonment you will not be

3    released on parole, you will serve the entire term?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  In addition, when you get out of

6    prison and serve your term of supervised release, you will

7    be required to observe certain conditions.  If you are

8    found by a court to violate any of those conditions, then

9    you may be returned to prison to serve an additional

10   term.  Do you understand that?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  And do you understand that you would

13   be required to serve that additional term even if the

14   total time is more than the plea agreement calls for?

15         THE DEFENDANT:  Yes, ma'am.

16         THE COURT:  The one hundred dollar assessment fee

17   that is attached to the sentence in this case is

18   mandatory.  Even though you and the government have

19   entered a plea agreement, you must still pay the full one

20   hundred dollar assessment fee; do you understand?

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  Ms. James, please recite the terms of

23   the agreement.

24         MS. JAMES:  Judge, in exchange for a plea of

25   guilty pursuant to Rule 11(c)(1)(C), the government agrees

1  to recommend a three-level downward departure pursuant to

2  U.S. Sentencing Guidelines Section 5K1.1.  The government

3  also agrees to a three-level reduction for acceptance of

4  responsibility pursuant to Sentencing Guidelines Section

5  3E1.1(a).  The government also agrees not to attribute

6  more than 50 grams of methamphetamine to this Defendant as

7  relevant conduct pursuant to Sentencing Guideline Section

8  2D1.1.  And in no event the government agrees that the

9  sentence should exceed 33 months.

10          There is a standard cooperation agreement

11  outlined in the plea agreement, Your Honor, including

12  further cooperation being considered the basis for a

13  possible Rule 35.  The Defendant has also waived her right

14  to appeal as well as collaterally attack the sentence with

15  the exception of prosecutorial misconduct or ineffective

16  assistance of counsel.  Those are just the standard terms

17  that are in most of the Middle District plea agreements,

18  Your Honor.  And she has given some cooperation to the

19  government and there is an ongoing agreement for

20  cooperation should the government need her.

21          THE COURT:  Thank you.  Ms. Murphy, you

22  understand that as a result of the government's

23  recommendations, you and the government expect that your

24  sentence in this case will be no more than just under

25  three years?

10

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Your cooperation agreement calls for

3  you to testify truthfully whenever you are called upon to

4  do so by the government; do you understand?

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  When you give testimony it must be

7  truthful.  If it is false testimony, the government may

8  use your false testimony against you in a later action for

9  perjury or making a false statement; do you understand?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  As long as you testify truthfully,

12  nothing that you say can be used against you in this or

13  any other case; do you understand that?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  Do you also understand that if you

16  testify falsely or make any false statement under oath,

17  the government can nullify or cancel this plea agreement?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  And that even if you have already

20  entered your plea, if you testify falsely and the

21  government cancels the agreement, you may not withdraw

22  your plea?

23          THE DEFENDANT:  Yes, ma'am.

24          THE COURT:  You have waived your right to

25  appeal.  The government, however, has not waived its right

11

1   to appeal.  So the government remains free to do so.  If,

2   however, the government appeals, then you may do so; do

3   you understand?

4           THE DEFENDANT:  Yes, ma'am.

5           THE COURT:  There are two ways that you can end a

6   criminal prosecution, Ms. Murphy.  One is by doing what

7   you are now doing, entering a guilty plea.  The other is

8   by going to trial.  By entering a guilty plea you waive

9   your right to trial and all of the constitutional rights

10  you would have at trial.  Do you understand that if you

11  elected, as you are constitutionally permitted to do, to

12  go to trial, you would be presumed innocent?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  Until the government proved your

15  guilt beyond a reasonable doubt?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  Do you further understand that at a

18  trial you would have these following constitutional

19  rights:  the right to see and hear all of the witnesses

20  against you, the right to have them cross-examined in your

21  behalf by your lawyer, the right to testify on your own if

22  you decided to do so, and the right to decline to testify

23  if you chose not to do so without having that used against

24  you?  Those are the constitutional rights you would have

25  at trial.  Do you understand that by entering a guilty

12

1  plea you waive those rights?

2        THE DEFENDANT:  Yes, ma'am, I do.

3        THE COURT:  And finally, do you understand that

4  once your plea is entered there will be no trial in this

5  case?

6        THE DEFENDANT:  Yes, ma'am.

7        THE COURT:  The presentence -- the probation

8  office will prepare a presentence investigation report for

9  the Court to use at your sentencing.  That report will

10 contain information about your criminal history,

11 employment, education and finances.  During the

12 preparation of the report you will be required to answer

13 additional questions and provide information.  Do you

14 understand?

15       THE DEFENDANT:  Yes, ma'am.

16       THE COURT:  Once it is prepared, you will have

17 the opportunity to make objections and at sentencing you

18 may object further.  Do you understand that?

19       THE DEFENDANT:  Yes, ma'am.

20       THE COURT:  Having indicated to the Court that

21 you understand the charge, the maximum penalty, the terms

22 of the plea agreement and your constitutional right --

23 rights, you should now tell me how you plead.

24       THE DEFENDANT:  Guilty.

25       THE COURT:  Tell me what you did, when and where,

13

1    and be sure in doing so that you specify the quantity of

2    drugs attributable to you.

3         THE DEFENDANT:  About November -- up until

4    November 2005 I was involved with several different people

5    distributing and possessing with the intent to distribute

6    methamphetamine of more than 50 grams in the Middle

7    District of Alabama.

8         THE COURT:  All right.  And when you were

9    involved with those people, did you conspire with them to

10   distribute methamphetamine?

11        THE DEFENDANT:  Yes, ma'am.

12        THE COURT:  Where were you?  I know you said

13   Middle District of Alabama, but where did this occur?

14        THE DEFENDANT:  Autauga County.

15        THE COURT:  Mr. Moorer, satisfied?

16        MR. MOORER:  Yes, Your Honor.

17        THE COURT:  Ms. James?

18        MS. JAMES:  Yes.

19        THE COURT:  It is the finding of the Court in the

20   case of United States versus Shannon Murphy that the

21   Defendant is fully competent and capable of entering an

22   informed plea, that the Defendant is aware of the nature

23   of the charges and the consequences of the plea, and that

24   her plea of guilty is a knowing and voluntary plea

25   supported by an independent basis in fact containing each

14

1   of the essential elements of conspiracy to possess with

2   intent to distribute methamphetamine.  The plea is

3   therefore accepted and the Defendant is now adjudged

4   guilty of the offense.

5        This case is assigned to Judge Fuller.  You are

6   in custody; is that correct?

7        THE DEFENDANT:  Yes, Your Honor, I am.

8        THE COURT:  The custody sentence in this case is

9   now set for 21 November 2006.  That date may change, but

10  that is the date as of today, Ms. James.

11       MS. JAMES:  What was that, Judge?

12       THE COURT:  21 November 2006.

13       MS. JAMES:  That's sentencing?

14       THE COURT:  Yes.  Thank you.  The Defendant is

15  remanded.  You are discharged, Ms. James.

16       MS. JAMES:  Thank you, Your Honor.

17       (At which time, 9:17 a.m., the hearing was adjourned.)

18            *  *  *  *  *  *  *  *  *  *  *

19

20

21

22

23

24

25

15

1                    COURT REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5          This 8th day of June, 2007.

6

                            /s/ James R. Dickens
7                           Official Court Reporter

8                    TRANSCRIBER'S CERTIFICATE

9          I certify that the foregoing is a true and

10   correct transcript, to the best of my ability, from the

11   stenographic notes provided to me by Official Court

12   Reporter James R. Dickens.

13         This 8th day of June, 2007.

14

15                          /s/ Risa L. Entrekin
16                          Registered Diplomate Reporter
                            Certified Realtime Reporter
17                          Official Court Reporter

18

19

20

21

22

23

24

25

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:06-cr-122-MEF-VPM |
| | ) | |
| SHANNON S. MURPHY | ) | |

## GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE
## PURSUANT TO § 5K1.1, UNITED STATES SENTENCING GUIDELINES

**COMES NOW** the United States of America, by and through Leura G. Canary,
United States Attorney for the Middle District of Alabama, and files the above-captioned
motion, and as reasons therefore, submits the following:

1.  Defendant entered a plea of guilty pursuant to a plea agreement under Rule
11(c)(1)(C) to an indictment charging a violation of Title 21, United States Code, Section
846.

2.  Defendant agreed to cooperate with the Government in the instant cause and
in subsequent investigations as necessary, and to waive the rights to appeal or collaterally
attack the guilty plea or sentence.

3.  The United States submits the defendant has cooperated with the United States
and has abided by the terms of the plea agreement.  The assistance provided by the
defendant should be considered substantial.

4.  The United States respectfully requests a 3 level downward departure under §
5K1.1 U.S.S.G., and moves this Court to impose a sentence of 27 months imprisonment
which is in accordance with the plea agreement.



GOVERNMENT
EXHIBIT
E

Respectfully submitted this the 6th day of November, 2006.

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/Terry F. Moorer
TERRY F. MOORER
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: terry.moorer@usdoj.gov
ASB-1176-O73T

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
    )
v.    )    CR. NO. 2:06-cr-122-MEF
    )
SHANNON S. MURPHY    )

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to

the following: Susan G. James, Esquire.

Respectfully submitted,

/s/Terry F. Moorer
TERRY F. MOORER
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: terry.moorer@usdoj.gov
ASB-1176-O73T

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CASE NO.  2:06CR122-MEF** |
| | * | |
| **KENDALL WATSON** | * | |
| **CALVIN CHANCE** | * | |
| **SHANNON MURPHY** | * | |

## DEFENDANT MURPHY'S POSITION ON SENTENCING

### I. INTRODUCTION

On November 21, 2006, the Court is scheduled to sentence defendant

Shannon Murphy.  Murphy has been in custody since August 21, 2006

Murphy entered a plea agreement pursuant to 11(c)(1)(C).  As agreed, her

sentence should not exceed 33 months.  Otherwise she may withdraw her plea and

proceed to trial.  The Government has filed a motion requesting a three level

downward departure to 27 months.  Murphy contends her sentence should actually

be less than 27 months as will be outlined to follow:

### II. COOPERATION

As noted in the presentence report Shannon Murphy was originally arrested

by the Autauga County Sheriff's Department on October 16, 2005 after having

made a controlled sale of .5 grams of methamphetamine to a confidential source.  A

subsequent search of Murphy's residence revealed 8.78 grams of methamphetamine.



GOVERNMENT
EXHIBIT

F

Murphy agreed to cooperate with law enforcement and provided them the name of her source, Calvin Chance. Murphy made an undercover call to Chance. As a result he was arrested, taken into custody, and found to be in possession of 55.73 grams of methamphetamine. After Chance was arrested he agreed to cooperate against his source, Kendall Watson, who was a substantial source of methamphetamine. Chance advised that he was receiving four ounces of ice per week from Watson at a cost of $1,500 to $1,600 per ounce.

Watson, after his arrest, has cooperated extensively with law enforcement including providing jailhouse information against federal inmate Leon Carmichael. Watson has also testified in that case.

The presentence report further indicates that Murphy provided a proffer on March 1, 2006 about her drug activities.

Without question, Murphy's cooperation with law enforcement has resulted in the arrest, prosecution, pleas of guilty and incarceration of two major methamphetamine sources Calvin Chance and Kendal Watson. Murphy also is ready and available to testify against others about whom she provided information to the Autauga County Sheriff's Department and the United States Government. Murphy was subpoenaed to testify at the sentencing of another female offender, although not called.

2

The presentence report memorializing the plea agreement indicated that the Government agreed to file a motion for a three-level downward departure based Murphy's cooperation. The motion has been filed. Murphy's base offense level is now 18 with a Criminal History Score of I. The suggested guidelines are 27 to 33 months. Murphy argues that her cooperation is more substantial than reflected in a three level downward departure. This involved more than a proffer. Two major drug dealers were arrested and subsequently cooperated with the Government in other cases casting an even bigger net on drug dealers.

### III. MENTAL HEALTH/PSYCHOLOGICAL CONDITION

The undersigned has spoken with Shannon Murphy and her parents extensively about her present situation and factors that led to her legal difficulties. Based on information in the presentence report, which has been verified through her parents, Murphy began using methamphetamine on a recreational basis and at some point became addicted to the drug. She has been in some mental health and drug treatment prior to her instant arrest. This involved a 28 day inpatient treatment program at Bradford Health in Warrior in 2002 and drug counseling at the Rainbow Counseling Center, Prattville, Alabama, 2000.

The undersigned, concerned over Murphy's mental state, referred her to Dr. Daniel Koch, Clinical Psychologist in Mobile, Alabama for evaluation and

3

treatment. Counsel was familiar with Dr. Koch's longstanding work as a psychologist in Mobile having worked with him on numerous occasions. Further, Counsel is aware of Dr. Koch's particular expertise in treating individuals suffering from Attention Deficit Disorder. As will be noted later in information to be provided by Dr. Koch, Shannon Murphy suffers from Attention Deficit Disorder that has gone untreated throughout her lifetime. Prior to the bond revocation Dr. Koch, through a medical doctor, prescribed for her Adderal as well as a drug for her depression.

Dr. Koch is expected to testify that Shannon Murphy's attraction to methamphetamine was related to a need to self-medicate for her Attention Deficit Disorder which has complicated her self-image problems throughout her life. Compounding the problem was the loss of her sister, Christy, through a methamphetamine overdose.

Even subsequent to her arrest and while on bond Murphy admits to having used methamphetamine. This drug usage as well as her attempt to conceal this drug use resulted in her bond revocation and her present incarceration.

One of the primary goals of this plea agreement, both from the defense side and the Government's, was that Murphy would receive drug treatment. Certainly this can be provided through the Bureau of Prisons but it is our position that it can

be provided in the community as well. Murphy's incarceration since revocation on August 21, 2006 has served as a tremendous deterrent to her given that she has not previously been in custody. The undersigned believes that the Court could impose a sentence of less than that suggested by the sentencing guidelines which would ensure accountability and punishment. This could still offer a successful regiment of drug treatment given that she is now motivated to beat this horrific addiction.

## IV. FAMILY SITUATION

Counsel is familiar with the fact that this Court often sees and sentences single parents to custody despite the fact they have small children at home. This situation presented by Shannon Murphy is different than counsel normally experiences with female clients with small children at home who are facing incarceration. In this particular case Ms. Murphy has the strong and stable support of her mother and father who presently have custody of and are caring for her minor son, Jacob Murphy, age 6. Jacob's father offers little support.

Despite this support and the blessing of her parents being able to care for her minor child, the parents also care for the two minor children of their deceased daughter, Christy, who are ages 11 and 6.

Young Jacob Murphy was in counseling prior to his mother's bond revocation as a result of anxiety and attachment issues. Because the Silas' and the three minor

5

children described above live on family property (previously as immediate next door neighbors), the children are extremely familiar with events and activities of each other. The untimely and tragic death of Christy, Ms. Murphy's sister, and the physical pain and suffering of her two children witnessed by Jacob, has influenced his psychological condition. This has impacted him to the extent that he has several psychological issues that are presently being dealt with by mental health professionals. Correspondence confirming this will be provided to the Court. His counselor's opinion is that the lengthy incarceration of his mother will have an unduly negative impact on the child.

Not only is Jacob a victim of methamphetamine as are his two cousins, but also the parents of Shannon Murphy. The trauma associated with drug addiction of their now incarcerated daughter Shannon has been devastating. However, the loss of their other daughter to a methamphetamine overdose has been more devastating to this family. Now the prospect of losing their only daughter to incarceration, over her poor judgement and substance abuse, is almost more than this family can bear.

The Silas' are a middle class, hard working family with good values and good goals. They raised their two children like most parents would want them raised and society would expect. However, the availability of drugs and the vulnerability of these two daughters has almost completely destroyed this family.

6

Any benevolence the Court could show this family by reducing the suggested period of incarceration to allow for a brief period of punishment or a punishment in the community wherein she could receive drug treatment would be appropriate under the circumstances.

## V. CONCLUSION

Shannon Murphy is a first offender, meth addict, mother of a six year old son, and suffers from severe Attention Deficit Disorder. Prior to her bond revocation she was beginning a course of treatment with Dr. Daniel Koch in Mobile and the same seemed very positive in order to control her need for illegal drugs.

Murphy has cooperated with the Government in assisting them in removing from the streets two significant drug dealers and possibly more. Murphy has now experienced the reality of incarceration in a County Jail system for a woman who has never experienced anything similar. She has the stability of her family and will live on family property.

The suggested guideline range is 27 to 33 months. Given all the arguments and mitigation above it is respectfully requested that this Court impose a sentence of 10 to 16 months (Base Level 12) allowing Ms. Murphy to have intermittent confinement with drug treatment in the community so that she may remain at home and resume the responsibilities for the rearing of her six year old child. This, too,

7

would enable her to conquer her addiction to methamphetamine.  It is anticipated that the course of treatment that she will be placed on by Dr. Koch will in fact be successful.

A base level 12 would only require a five level departure from the suggested base level of 18.

Extreme family hardship may now be considered as a basis for a departure from the suggested guidelines.

Respectfully submitted,

> s/Susan G. James
> SUSAN G. JAMES
> Attorney at Law
> 600 South McDonough Street
> Montgomery, Alabama 36104
> Phone: (334) 269-3330
> Fax: (334) 834-0353
> E-mail: sgjamesandassoc@aol.com
> Bar No: JAM012

## CERTIFICATE OF SERVICE

I hereby certify that on November 15,  2006 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Louis Franklin
United States Attorney
P.O. Box 197
Montgomery, Alabama, 36101

8

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                NORTHERN DIVISION

4

5  UNITED STATES OF AMERICA

6     vs.            CR NO: 06cr122-MEF

7  SHANNON S. MURPHY,

8

9            * * * * * * * * * * *

10            SENTENCE HEARING

11           * * * * * * * * * * *

12

13       Before the Honorable Mark E. Fuller,

14        United States District Judge, at

15   Montgomery, Alabama, on November 21, 2006

16           * * * * * * * * * * *

17

18  APPEARANCES:

19  FOR THE GOVERNMENT:   Terry F. Moorer,
                   Assistant United States Attorney

20

21  FOR THE DEFENDANT:  Susan G. James,
                   Attorney at Law

22

23

24

25

---

**2**

1     (The above case coming on for hearing at Montgomery,

2  Alabama, on November 21, 2006, before the Honorable Mark E.

3  Fuller, United States District Judge, the following proceedings

4  were had commencing at 10:45 a.m.:)

5     THE COURT: The Court calls the case of United States

6  of America versus Shannon S. Murphy, case number 06cr-122, in

7  the United States District Court for the Middle District of

8  Alabama, Northern Division. Is the United States prepared to go

9  forward this morning?

10     MR. MOORER: Yes, Your Honor.

11     THE COURT: Is the Defendant prepared to go forward?

12     MS. JAMES: Yes, Your Honor, we are.

13     THE COURT: Please approach, Ms. James, you and your

14  client. Ms. Murphy, today the Court will determine a reasonable

15  sentence in your case by considering the United States

16  Sentencing Guidelines which were promulgated pursuant to the

17  Sentencing Reform Act of 1984, and which are now advisory, and

18  by considering the factors set forth in 18 United States Code

19  Section 3553(a), Section 3553(e), and in your case Section

20  3553(f).

21     It appears that there has been a plea agreement that

22  has been reached in this case under the portions of the Federal

23  Rules of Criminal Procedure, Rule 11(c)(1)(C), commonly referred

24  to as a binding plea agreement. If that is the case I would ask

25  counsel either for the United States or for the Defendant to

---

**3**

1  recite the terms of the plea agreement.

2     MR. MOORER: Yes, Your Honor. The United States agreed

3  that the Defendant would enter a guilty plea to count one of the

4  indictment, and that we would file a motion for a three level

5  downward departure under 5K1.1, and recommend the low end of the

6  resulting sentencing guidelines range. We also agreed that the

7  Defendant would be entitled to three points for acceptance of

8  responsibility and attribute no more than 50 grams of

9  methamphetamine to the Defendant as relevant conduct, and in no

10  event would the sentence exceed 33 months. The Defendant also

11  agreed to waive her right to appeal or to collaterally attack

12  the sentence.

13     The United States has filed a downward departure motion

14  under Section 5K recommending that the Defendant receive a

15  sentence of 27 months imprisonment -- I'm sorry, of 37 months

16  imprisonment, Your Honor. It was 27 with the three levels? I'm

17  sorry, 27 months imprisonment. The reason being, Your Honor,

18  when the investigation as to Ms. Murphy began we had targets of

19  individuals beyond Ms. Murphy that we were primarily interested

20  in. Ms. Murphy, when she was targeted, immediately cooperated

21  that day with authorities to -- which led to the case against

22  the co-Defendants. And shortly --

23     THE COURT: For the record that's Mr. Chance and

24  Mr. Watson?

25     MR. MOORER: That's correct.

---

**4**

1     THE COURT: Or Watkins, I believe.

2     MR. MOORER: Watson.

3     MS. JAMES: Watson.

4     MR. MOORER: And her cooperation led to their arrest.

5  And immediately after she retained Ms. James we were able to

6  come to terms with her. Ms. Murphy's involvement, though

7  significant in the drug trade, was such that we felt that the

8  sentence that we agreed to was appropriate in light of her

9  cooperation with us. I don't believe that either Mr. Chance or

10  Mr. Watson, realizing that Ms. Murphy was cooperating with us,

11  felt that it was in their interest to proceed to trial and so

12  they came in very soon thereafter and allowed us to move on to

13  other targets quite quickly, Your Honor.

14     THE COURT: Anything to add either to the terms of the

15  plea agreement or to the reasons stated by the United States for

16  the variance or departure under 5K1.1 for your client's

17  substantial assistance, Ms. James?

18     MS. JAMES: Judge, I would just note for the record

19  that I agree with what Mr. Moorer said with regard to her

20  immediate cooperation. As the Court knows from my sentencing

21  memo, and I intend to address today, she has had a substance

22  abuse problem. But I would submit that these weren't two small

23  people that she cooperated against. In fact, she worked

24  proactive to have Mr. Chance arrested and then that information

25  led to Mr. Watson.

GOVERNMENT
EXHIBIT

G

5

1    And this Court may not know it, and Mr. Watson is, in
2  fact, not only cooperating with the government with regard to
3  the drug activity that he was involved with, but he is also
4  cooperating with the government and is a witness against
5  Mr. Carmichael in a very protracted ordeal that's going on
6  before Judge Thompson. So in addition to that she was ready,
7  willing and available to testify at the government's request in
8  the matter of Crystal Bazell, who was sentenced, I am not sure
9  if it was by this Court. She was not ultimately used, but she
10 was attended by the government when she was on bond to testify
11 and was prepared to do so. So I certainly think that the plea
12 agreement that was negotiated is appropriate and we would ask
13 the Court to adopt it.
14    THE COURT: I will state for the record, Ms. Murphy,
15 that it is the Court's intentions to accept the plea agreement
16 and sentence you in accordance with the negotiated plea
17 agreement between yourself and the United States. Beginning
18 with the United States' motion for reduction of sentence for
19 acceptance of responsibility under 3E1.1, particularly document
20 number 118, without objection, that motion is granted and the
21 third point for your acceptance of responsibility will be
22 calculated in making the initial findings that the Court will
23 make before I consider the motion for downward departure for
24 your substantial assistance.
25    Ms. James, have you and Ms. Murphy had an opportunity

6

1  to review the presentence report before today's date?
2    MS. JAMES: Yes, Your Honor.
3    THE COURT: Do you have any objections to any of the
4  contents of the presentence report?
5    MS. JAMES: No, sir, we do not.
6    THE COURT: There being no objections to the
7  presentence report, the Court adopts the factual statements
8  contained in the presentence report with specific findings under
9  the guidelines that the offense level is 21, the criminal
10 history category is I, the guideline range is from 37 months to
11 46 months, and the supervised release period is from three to
12 five years, and the fine range is from seven thousand five
13 hundred dollars to four million dollars. As has been stated,
14 the United States has filed a motion for downward departure due
15 to your substantial assistance, Ms. Murphy, pursuant to United
16 States Sentencing Guidelines Section 5K1.1. And for the record
17 that is document number 119. Anything further to add to the
18 record other than what has been stated either by the United
19 States or by the Defendant?
20    MR. MOORER: No, Your Honor.
21    MS. JAMES: Not with regard to cooperation, Judge.
22    THE COURT: Having sentenced Mr. Chance earlier today,
23 Ms. Murphy, I will also reflect upon what has been stated in his
24 sentencing as a factual basis to make this Court's findings that
25 your cooperation does arise to that of substantial assistance to

7

1  the United States, and for that reason the United States' motion
2  for downward departure based upon your substantial assistance
3  should be, and is granted. This finding results in a reduction
4  in the recommended guideline sentence to a guideline level of an
5  offense level of 18, which, when combined with the criminal
6  history category, creates a guideline range of 27 months to 33
7  months, and a fine range from six thousand dollars to four
8  million dollars.
9    Ms. James, do you or Ms. Murphy have anything to say in
10 mitigation or otherwise before the Court pronounces sentence in
11 this case?
12    MS. JAMES: Yes, Your Honor, I do. I have three
13 people -- well, just to make the record clear, I have requested
14 that the Court consider an additional downward departure from
15 the guidelines as suggested in this case to a range of base
16 level of 12 or lower, allowing for Ms. Murphy to remain in the
17 community with some additional conditions, whether that be
18 intermittent confinement or whatever the Court would deem
19 appropriate. I have three witnesses available -- well, actually
20 the parents would like to be heard from. I do have one witness
21 that I would like the Court to hear in support of my request for
22 departure, and that's Doctor Daniel Koch. He is a clinical
23 psychologist from Mobile that was working with Ms. Murphy prior
24 to her bond revocation in August of this year.
25    THE COURT: You may call your first witness, and if you

8

1  have witnesses that would take some time you can return to
2  counsel table so that Ms. Murphy is not standing up there the
3  whole time.
4    THE CLERK: You do solemnly swear or affirm that the
5  testimony you give in this cause to be the truth, the whole
6  truth, and nothing but the truth, so help you God.
7    THE WITNESS: I do.
8    THE COURT: Doctor, be careful as you sit down, there's
9  a speaker underneath that podium at your right knee, just be
10 mindful not to injure either your right knee or our speaker.
11    THE WITNESS: Yes, sir.
12    THE COURT: Adjust yourself so you can be heard by the
13 Court and everyone participating. Ms. James, you may proceed.
14    DANIEL L. KOCH, witness for the Defendant, having been
15 duly sworn or affirmed, testified as follows:
16                 DIRECT EXAMINATION
17 BY MS. JAMES:
18 Q. Would you state your name, please.
19 A. Daniel L. Koch.
20 Q. How are you employed, Doctor Koch?
21 A. I am a clinical psychologist in private practice in Mobile
22 currently.
23 Q. And how long have you worked in that capacity?
24 A. I have worked in Alabama as a clinical psychologist since
25 1974. I have been in private practice since about 1979.

9

1  Q. Now, as a part of your private practice as a clinical
2  psychologist do you have occasion to perform psychological
3  evaluations and assessments on individuals?
4  A. Yes, I do. On a daily basis virtually.
5  Q. In that same capacity do you also involve yourself in
6  recommending treatment programs for people that come to you for
7  evaluation and treatment?
8  A. Yes.
9  Q. And at my request have you had occasion to evaluate and
10 perform psychological testing on Shannon Murphy, the Defendant
11 in this case?
12 A. Yes, I have.
13 Q. Do you recall when that was?
14 A. I evaluated her approximately eight hours on 7/26/06, and
15 were not able to complete everything that I felt I needed to do
16 at that time, and we had her back for about four hours on the
17 next month, 8/8/06.
18 Q. Okay. Did you complete your evaluation and assessment to
19 your satisfaction?
20 A. Yes, I did.
21 Q. And as a result of that testing that you did on Ms. Murphy
22 have you had occasion to formulate an opinion about any
23 psychological conditions that she may presently have?
24 A. Yes, I have.
25 Q. Will you tell the Court what type tests you administered and

10

1  your conclusions.
2  A. I administered the Halstead-Reitan Battery, which is one of
3  the two test measures that the Federal Register recognizes as
4  valid in identifying organic brain deficits. I administered the
5  Minnesota Multiphasic Personality Inventory, the Millon Clinical
6  Multiaxial and Personality Inventory, and the test for variables
7  of attention, which is a test designed to determine the presence
8  or absence of attention deficit disorder.
9  Q. After having administered those tests what conclusions did
10 you reach with regard to her present condition?
11 A. Well, she complained initially in response to a personal
12 history questionnaire of problems with concentration, problems
13 making decisions, her memory problems, numerous other problems,
14 depression, but the concentration and memory issues are the ones
15 that were the central thrust of the neuropsychological
16 assessment which falls into three categories, if one indeed has
17 an impairment. All of the tests of the battery -- and this is
18 about an eight hour test -- eight hour battery of tests. All of
19 the data is submitted to the computer algorithm which generates
20 a score, so whoever gave this wherever in the country we would
21 come up with the same basic answer, and that is that she has
22 mild neuropsychological deficits. That is, there is a
23 dysfunction of the brain.
24     And what we see with this patient is that when she has
25 to do problem-solving thinking that involves using information

11

1  and coming up with a good, valid analysis of it, she is
2  impaired. She can't do hypothetical or deductive
3  problem-solving thinking as well as a person that doesn't have
4  any brain trauma or any brain insult. Now, this is not related
5  to education. People with no formal education can do this test
6  within normal limits, so this is the behavior of the brain due
7  to an impairment.
8      It's clear from her IQ that -- the scattering of the IQ
9  that she started out with her brain in the normal range
10 intellectually, but she has always had an attention deficit
11 disorder. The attention deficit disorder test is unequivocally
12 positive. She has attention deficit without hyperactivity. It
13 is not at all unusual for this condition not to be noted in the
14 classroom because these individuals aren't disruptive, they are
15 not problems, they just don't learn well.
16     And while this Defendant has finished high school and
17 attended about a year and a half of junior college after high
18 school, never the less, her reading skills are merely 6th grade,
19 her spelling 8th grade, and her math 4th grade. She did not
20 profit from her education. And this has caused a measurable
21 decline in IQ, where her verbal IQ is 79, where 70 would be a
22 mild mental retardation. Her performance IQ that is non-verbal
23 things, hand-eye-type tasks, are better. They are in the
24 average range at 95, which is the 37th percentile. This leaves
25 her functioning overall at IQ of 85, which is the 16th

12

1  percentile.
2      What is important about the attention deficit disorder
3  in relation to this Defendant's behavior is that my
4  recommendation to her family physician, Doctor James Byrd, was
5  to start her on medication for attention deficit disorder. I
6  recommended Adderal, 20 milligrams, and this is a
7  psycho-stimulant. I also recommended medications for depression
8  because the patient has suffered depression.
9      People who have attention deficit are extremely
10 vulnerable when this is not identified to become involved with
11 amphetamines. Methamphetamine being a stimulant, it's available
12 on the street. Its pharmacology -- its pharmacological action
13 on the brain is not very different from what we would
14 prescribe. Of course, there is a problem that when people use
15 drugs on the street we don't know the purity level and we don't
16 know how much they are going to use. But I see an unusually --
17 an unusual over-representation of people with attention deficit
18 disorders that get involved with methamphetamine as opposed to
19 other drugs.
20     The medication which we recommended and which her
21 family doctor did prescribe for her is pharmacologically very
22 similar to the drug which she was abusing.
23 Q. Did you develop evidence not only because of this case but
24 in your interviews and your testing of her that she has a
25 substance abuse problem?

13

1  A. Yes.

2  Q. Am I hearing you say that -- in some ways I guess I am kind

3  of summarizing what you are saying -- that undiagnosed and

4  without medication that the use of methamphetamine for someone

5  like Shannon Murphy would be kind of a self-medicating

6  situation?

7  A. Yes, it is. I don't have an attention deficit, you don't.

8  If we took methamphetamine we would be very uncomfortable, heart

9  rate would accelerate, thoughts would race, loss of appetite,

10 not sleeping. To someone that has the biochemical makeup for

11 attention deficit the drug has a calming effect. They have a

12 paradoxical reaction to medication. If we give them something

13 that's sedating it doesn't sedate them. Like alcohol, usually

14 most people drink alcohol, a couple of drinks they get sleepy.

15 You give alcohol to someone with attention deficit, after a

16 couple of drinks they need a couple more and they want to

17 party. So they just don't have brain chemistry that the general

18 population has.

19     And they -- when they run up on methamphetamine it has

20 a calming effect, they feel better, their esteem is higher, they

21 can concentrate better, their memory functions are better, if

22 they were taking it on, you know, a reasonable basis. But it's

23 very easy for them to get addicted to it. It is a Schedule IV

24 medication, meaning that we are very cautious about whom we

25 prescribe it for. It's very tightly regulated. The

14

1  prescription is given, it has to be handed to the patient. It

2  has to be negotiated at the pharmacy within 72 hours if it's not

3  filled. So it's not a substance that we give lightly, but when

4  people need it it enables them to function in our society that

5  they can't function well without it.

6  Q. Do you believe based on your training and your experience as

7  knowledge of how this case has progressed do you know if

8  Ms. Murphy actually received a prescription that you recommended

9  to her family physician?

10 A. Well, I know that there was a delay of several weeks in her

11 getting an appointment. I wrote her physician on a -- I

12 completed my evaluation August 8th, I wrote him August 10th and

13 faxed it to him. I wasn't aware that it would be several weeks

14 before she could get in to see him or I would have called the

15 doctor and explained her situation. And my understanding is

16 before she could get in to see him, and he did prescribe for

17 her, she violated the terms of her being out on bond.

18 Q. Do you believe based on your training and your experience as

19 well as your evaluation and assessment of Ms. Murphy that she

20 could be positively impacted by the use of the legal prescribed

21 Adderal that you have just discussed?

22 A. By all means, otherwise I wouldn't have recommended it and

23 Doctor Byrd wouldn't have prescribed it. She unequivocally has

24 this disorder, and the only treatment we have for it is proper

25 phycho-stimulants in the proper amount. Now, she also was

15

1  situationally depressed and so I did make a recommendation for

2  that.

3  Q. Now, we have -- I have requested on her behalf that she be

4  given a sentence that would require possibly some intermittent

5  confinement in addition to substance abuse counseling, and have

6  you and I had an occasion to discuss that?

7  A. Yes, we have.

8  Q. Tell the Court what your opinion is with regards to her

9  probability for success given the testimony you have already

10 given plus responding to my question.

11 A. Well, she has been given the antidepressant medication, she

12 has not been given the medication for attention deficit while

13 she is incarcerated. But for her to have vocational assistance

14 she would require that medication in Mobile, and understanding

15 you have a program here, the Rainbow Counseling Center. She

16 would -- if she were in a program such as that she would get

17 vocational values and counseling, she would get the appropriate

18 medications, and she would be able to accomplish much more in

19 her life. She is an appropriate candidate for vocational

20 rehabilitation to be trained in an area in which she has an

21 interest. Her ability to function intellectually would be

22 enhanced by appropriate medication and I think she could be

23 habilitated to an employment position in the community that

24 heretofore hasn't been available for her through counseling and

25 guidance about drug use and appropriate use of her needed

16

1  medication.

2  Q. Doctor Koch, during the time period that Ms. -- since

3  Ms. Murphy's arrest until August, I think August 21st of '06,

4  she was on bond and reporting to a pretrial service officer with

5  the United States probation office, are you aware of that?

6  A. Yes.

7  Q. Are you aware that Ms. Murphy did violate the conditions of

8  her bond by using methamphetamine?

9  A. I am.

10 Q. And are you also aware of the circumstances under which she

11 was detected?

12 A. Yes, I am aware that she attempted to deceive a drug screen.

13 Q. Based on your experience and your some 30 years of dealing

14 with people with substance abuse, do those facts negate the

15 possibility of her success on the type program that I have

16 suggested and you have testified about?

17 A. No, they don't. Until someone gets on a proper medication

18 regimen when they are under surveillance about drug use, I

19 always order a panel-four drug screen. That's a drug screen

20 that is a chain of custody where we watch the collection of the

21 urine, because they will do anything to avoid detection of it

22 for fear of the consequences. But they are on the horns of a

23 dilemma, it is an addiction.

24 Q. Is there anything else you feel you should tell the Court

25 about your evaluation of Ms. Murphy and your suggested

17

1   treatment?

2   A.  Well, I think what I would say is that this is a sad

3   situation that I see quite often.  In discussing my testing I

4   said we don't identify attention deficit disorder kids in the

5   school system unless they are hyperactive.  If they are

6   hyperactive they cause enough trouble and we identify them.  But

7   they constantly under-achieve and it damages their self-esteem.

8   Much to her credit she did finish high school even though she

9   wasn't getting it, and she tried after that.  I think this

10  reflects the values of the family from which she comes and I

11  think that they are good indicators that if she were given the

12  resources which she needs that she would become a stable,

13  employable member of the society.

14  Q.  Doctor Koch, there's some evidence that she has made a

15  couple of prior attempts at rehabilitation with drug treatment.

16  If during those occasions she were not identified as having the

17  attention deficit disorder and without the medication would that

18  enhance or decrease here likelihood of successes in the prior

19  attempts at rehabilitation?

20  A.  It would dramatically reduce the possibility of her

21  profiting from the program.

22      MS. JAMES:  That's all the questions I have, if you

23  would answer the prosecutor's.

24

25

18

1               CROSS-EXAMINATION

2   BY MR. MOORER:

3   Q.  Doctor Koch, you are not suggesting that Ms. Murphy was so

4   impaired as to be unable to appreciate the fact that her drug

5   use and abuse and distribution would be wrong and a violation of

6   the law.

7   A.  No, I am not suggesting that, sir.  I would say that her

8   comprehension and her problem-solving skills are certainly less

9   than average.  But no, I am not making that suggestion.

10  Q.  Sufficient to where she can make reasoned choices not to

11  engage in criminal behavior; correct?

12  A.  She knows right from wrong, yes, sir.

13  Q.  And in essence if I understand what you are saying is that

14  she has a mild case of attention deficit disorder and that

15  she'll benefit from medication.

16  A.  No, sir, what I am saying is she has a mild case of organic

17  brain disorder.  In addition to that she has an attention

18  deficit disorder.  I don't know what the etiology of her mild

19  neuro-cognitive deficits are.  That would take further work,

20  neuro-imaging and other things.

21  Q.  But in any event, regardless of the cause, in essence what

22  you are saying is that her attention deficit disorder will in

23  your opinion likely be either resolved or much greatly reduced

24  if she receives the appropriate medication.

25  A.  Yes, sir.

19

1   Q.  And you would agree that it would be beneficial for her to

2   be away from illegal narcotics.

3   A.  I agree it would be better for all of us, yes, sir.

4   Q.  And those who are involved in that type of culture.

5   A.  Certainly.

6       MR. MOORER:  No further questions, Your Honor.

7       MS. JAMES:  May I have one followup?

8       THE COURT:  You may.

9               REDIRECT EXAMINATION

10  BY MS. JAMES:

11  Q.  Doctor Koch, based on your many years as a clinical

12  psychologist and having treated many criminal Defendants would

13  you agree that there are people involved in the drug trade that

14  are incarcerated?

15  A.  Yes.

16  Q.  I am saying while -- involved while they are incarcerated.

17  A.  Oh, yes, certainly.  Yes.  There are drugs available in the

18  system.

19      MS. JAMES:  That's all the questions I have.

20      THE COURT:  Anything further by the United States?

21      MR. MOORER:  No, Your Honor.

22      THE COURT:  Doctor Koch, let me ask you a few questions

23  from the Court if I could.

24      THE WITNESS:  You may.

25      THE COURT:  You have described a recommended treatment

20

1   plan based upon your diagnosis from a psychologist's standpoint

2   and I presume after consultation with her medical doctor for the

3   prescription of Adderal?

4       THE WITNESS:  Yes, sir.

5       THE COURT:  And your recommended treatment plan to this

6   Court for the success of Shannon Murphy would include some

7   treatment at the Rainbow Counseling Center, which I think

8   counsel has already pointed out that she had not successfully

9   benefited from back in 2000.

10  A.  I think it would be a very significantly different outcome

11  if she had the proper medication.  And they would have no way of

12  knowing that unless they ran a neuropsychological assessment and

13  had the equipment that I have to make this kind of workup.  It's

14  about a 12 hour evaluation that she was subjected to.

15      THE COURT:  So you are just basically recommending to

16  the Court a different combination of treatment available to

17  Ms. Murphy to ensure her success.

18      THE WITNESS:  Yes, sir.  But also though, where she is

19  with herself emotionally and in her abilities and her successes

20  in her life to this point has been impaired by the fact that she

21  can not concentrate for more than ten minutes without her mind

22  just going off somewhere else.  This has prevented her

23  academically, it's prevented her vocationally, and it can be

24  entirely eliminated by one pill a day.

25      THE COURT:  Is she on that medication to your

21

1  knowledge?

2      THE WITNESS:  She is not on it while she is

3  incarcerated because she is not involved in a learning

4  experience or counseling.  And I think that it's something that

5  because it is a controlled substance they don't like to have to

6  fool with it in incarcerated settings.  She has been given and

7  is being given antidepressant medications but not the

8  psycho-stimulant.

9      THE COURT:  Which is Adderal?

10      THE WITNESS:  Yes, sir.  There are other

11  psycho-stimulants, there's Ritalin, there's Concerta.  There are

12  a number of others.  Adderal is a preference of mine.

13      THE COURT:  In your more than 30 years of practice in

14  Alabama as a psychologist can you give this Court any opinion as

15  to how likely her success would be with the combination of drug

16  treatment and Adderal?

17      THE WITNESS:  Based on my understanding of her and the

18  support that she has from her family I think she would be very

19  successful.  I don't think that you would see her back here

20  again.  I would also want her to have vocational counseling, and

21  I understand Rainbow has that.  I certainly know as a consultant

22  to the State Department of Vocation and Rehabilitation that all

23  of their services would be available to her.

24      THE COURT:  That's all the questions I have.  Anything

25  further, Ms. James?

22

1      MS. JAMES:  Not from this witness, Judge.

2      MR. MOORER:  No, Your Honor.

3      THE COURT:  Thank you, Doctor Koch, you may step down.

4      THE WITNESS:  May I be excused, Judge?

5      THE COURT:  You may.

6      THE WITNESS:  Thank you.

7      THE COURT:  Call your next witness.

8      MS. JAMES:  Judge, if I might just kind of go out of

9  turn for a minute, this would lead up to what I need them for.

10  I am not certain if the Court received a letter from George

11  Walthal, the lawyer who knows Ms. Murphy and her family, but she

12  also worked for him.  If the Court hasn't seen that, I have

13  given a copy to the government.  And there's also a letter from

14  Rainbow Counseling regarding her six year old son who is being

15  seen by Mary Williams.  If I might hand both of those forward to

16  the Court so you have them when I address those matters.

17      THE COURT:  You may.

18      MS. JAMES:  (Complies) Judge, I realize that prior to

19  January the 12th of 2005 the Court had limited discretion, and

20  particularly in situations involving family hardships, things of

21  that nature.  I have made many -- or I have made several, I

22  thought passionate pleas to various District Court Judges to

23  allow single mothers to be -- to remain in the community because

24  of child care needs and things of that nature.  And as I have

25  pointed out in my sentencing memorandum this case presents a

23

1  rather unique situation with regard to a single mother's need to

2  stay home.

3      Ms. Murphy, unlike many of the women that come before

4  this Court who have children, they have no husbands, they may

5  have an incarcerated husband, they have no family support with

6  regard to aunts, uncles, mothers and grandparents.  Ms. Murphy

7  has two parents who were very involved in her life -- both

8  present here in court -- that offer tremendous support for her,

9  not only financial support, not only moral support, but support

10  for her children.

11      Because of the problems with methamphetamine the

12  Murphys have had tragedies with both of their -- excuse me, the

13  Silases, that's the parents, they have had tragedies with both

14  of their children.  They lost their daughter Christy several

15  years ago to a methamphetamine overdose.  They have her two

16  children that live with them.  They have custody of those

17  children.  They live on family property, and so Ms. Murphy was

18  actually -- she and her son Jacob were next door neighbors, so

19  the three boys are not just cousins, they live together and they

20  interact.

21      But the emphasis that has been placed on the absence of

22  their mother, because their mother left and she is gone and she

23  is deceased, Jacob, her son, now with her absence, has had

24  separation anxiety.  And they are trying to head it off before

25  it happens, but there are obviously some problems that are

24

1  festering with regard to not only his mother's absence but

2  compounded by the fact that there -- his little cousins' mother

3  didn't come home.  And I think that Shannon Murphy could be

4  released to the community in some fashion that would ensure her

5  abstinence from drugs and protection of the community.

6      Now, I have the utmost confidence in Doctor Koch, and

7  he and I haven't always agreed, but this is an area that he has

8  particular expertise in.  And I am now, because of my work with

9  Doctor Koch -- and I am certainly not a psychologist -- but I am

10  now almost able to identify when I'm interviewing new clients

11  similar situations such as this where you get the same report

12  about the methamphetamine and their undiagnosed attention

13  deficit disorder.  So I really believe that this isn't some

14  hokey science, I think there's a lot of truth to this.

15      Now, that may have justified -- not justified, but

16  explained Ms. Murphy's use of methamphetamine.  We know why she

17  started selling methamphetamine, and that's because she didn't

18  have sufficient income to allow her to purchase it illegally so

19  she did unequivocally become involved in the distribution of

20  methamphetamine.  But I submit to the Court that it resulted

21  from her methamphetamine use.

22      The Court probably is wondering -- and I think her

23  parents can both speak to this.  I don't expect them to talk

24  with the Court for any length of time but I do think they have a

25  couple of important points.  But the Court must be wondering,

25

1  you know, what is different about Shannon Murphy today as
2  opposed to the support she had from her parents when she was
3  growing up or the support she had from her parents before August
4  21st of this year. She had strong family support. We know from
5  what Doctor Koch has said that with the introduction of Adderal
6  as part of a treatment plan that she can be successful and her
7  craving for illicit drugs would be satisfied.
8       In addition to that, we have Shannon Murphy having been
9  incarcerated now, Judge, for about three months, not at a
10  Marianna prison camp, not at some place that looks like a
11  college campus, but the Montgomery city jail with limited
12  hygiene products and thrown in with all sorts of people. In
13  fact, she was on the state side. She is now at the Autauga
14  County jail because there was an issue of a co-Defendant that
15  she had offered to testify against. So she has seen what she
16  had never seen before, and that is what the consequences are of
17  her actions.
18       And I believe, you know, not everyone needs three or
19  four years in prison to get their attention. I am satisfied --
20  and I have been doing this for a long time, for 20 years -- and
21  I hope that she doesn't disappoint me. And before the 20
22  years -- almost 20 years practicing law I worked in the federal
23  prison system, I worked not with females but I worked with male
24  inmates for eight years, so I have seen it from that side as
25  well. And not because I'm her retained counsel but I am putting

26

1  my money on her, and I hope she doesn't let me down, whether the
2  Court gives her 27 months or whether the Court gives her the
3  proposed sentence that I have requested.
4       I think she is a loving and caring mother and
5  daughter. I think that what she needs now are the tools to make
6  sure that she doesn't let anybody down. I really don't have a
7  whole lot more to say. I would like for the Court briefly to
8  hear from both of her parents and then I think she wants to
9  speak to the Court as well. And Judge, unless the government
10  wants them sworn, I think they can just speak.
11       THE COURT: I would prefer -- if they want to make a
12  statement they can approach and make it. If they need to be
13  sworn, they can make it from there, and if the government wants
14  to cross then we can move to different locations. But if they
15  want to make a statement let's have them first be sworn and
16  identified.
17       MS. JAMES: Tell the Court your names.
18       MR. SILAS: My name is Emmet Silas.
19       MRS. SILAS: My name is Vicky Silas.
20       THE COURT: If you would, let Ms. Gregg swear you in.
21       THE CLERK: You do solemnly swear or affirm that the
22  testimony you give in this cause to be the truth, the whole
23  truth, and nothing but the truth, so help you God.
24       MR. SILAS: Yes, I do.
25       MRS. SILAS: I do.

27

1       MR. SILAS: Your Honor, I just would like for the Court
2  to show as much mercy as you can. Just bear with me, please.
3  Because we lost our first daughter, and we certainly don't want
4  to lose this one. I appreciate the Court's intervening in her
5  drug use by all means. Because if they hadn't, we may have lost
6  her. Just be a -- do the best you can.
7       THE COURT: Would you like to make a statement,
8  Mrs. Silas?
9       MRS. SILAS: Yeah. I don't have a whole lot more to
10  add, he pretty much summed it up as far as Shannon goes. We
11  just don't want to lose her, she is all we have got left. We do
12  have her little boy. I have got my other daughter's two little
13  boys too, and I really need her to come home. I really need her
14  to come home. That's all.
15       THE COURT: Any questions, Mr. Moorer?
16       MR. MOORER: No, Your Honor.
17       THE COURT: I have some questions, Mr. and Mrs. Silas.
18  I want you to understand first of all I mean no disrespect in
19  what I'm about to ask both of you. Ms. James has pointed out in
20  her position on sentencing as a part of that motion to the
21  Court, the section on her family situation which does include
22  her children, her, I guess it's niece and nephew?
23       MRS. SILAS: Two nephews, yeah. They are all little
24  boys.
25       THE COURT: And all of whom are your grandchildren.

28

1       MRS. SILAS: Uh-huh. (positive response)
2       THE COURT: As was indicated here earlier today that
3  they all have resided in close proximity to one another on
4  family land. Did you during the time that your daughter Shannon
5  worked as late as May of 2005 at Maxwell Air Force Base live
6  near where Shannon lived?
7       MRS. SILAS: Yeah, she has always lived by us.
8       THE COURT: And you knew that she had been terminated
9  for her employment or from her employment at Maxwell -- Regions
10  Bank at Maxwell Air Force Base?
11       MRS. SILAS: Yes, sir, she told us that. Yeah, we knew
12  that.
13       THE COURT: You knew it at the time that it happened in
14  May of 2005?
15       MRS. SILAS: Yeah. Yeah.
16       THE COURT: So she was out of work according to what is
17  included in this report from May until October of 2005. How did
18  she support herself and her son?
19       MRS. SILAS: Well, most of her stuff was paid for and
20  she pretty much ate with us every day and she got unemployment.
21  I think she got some unemployment.
22       THE COURT: Then from October of '05 through March of
23  '06 she worked for Judge Walthal in Prattville, and then was
24  laid off based on shortage of work, not -- he does not indicate
25  that she was terminated for any wrong doing on her part. You

33

1  a guideline range of 24 months to 30 months, and a fine range
2  from five thousand dollars to four million dollars.
3      Before I hear anything further from you or Ms. James
4  about any reason for mitigation or any objections to that
5  finding, I want to say to you that I am going to sentence you
6  with two purposes -- three purposes in mind actually. I am
7  going to remove you from the associates that you have generated
8  through your drug distribution and drug consumption
9  environment. Okay?
10     THE DEFENDANT: Yes, sir.
11     THE COURT: I am from a small town. You are obviously
12 from a small town and everybody knows what goes on in a small
13 town. If I were to allow you to remain out with some type of
14 split sentence that you were serving in a county jail on the
15 weekend I don't think that would be best for you, Shannon.
16 Without some structured oversight it is my fear that I would be
17 contributing to your potential failure and that you would be
18 involving me in the web of manipulation that you have so
19 successfully created. So I am going to remove you from those
20 people that you have become involved with so that you are not
21 tempted when you are getting gas on the way home from work one
22 afternoon and run into one of your friends that you have been
23 involved in the methamphetamine business at the local Zippy Mart
24 and you succumb to that temptation and we are right back into
25 the position that you are in today except instead of looking at

34

1  a 24 to 30 months sentence you are going to be looking at
2  substantially more time. Okay?
3      THE DEFENDANT: Yes, sir.
4      THE COURT: The second thing I want to do based upon my
5  having heard the testimony of Doctor Koch is I want to get you
6  accessible to Adderal as quickly as possible. I want to give
7  you a chance to show me you can succeed.
8      THE DEFENDANT: Yes, sir.
9      THE COURT: The third thing is I want to get you into a
10 facility that has intensive residential substance abuse
11 treatment available to you with the benefit that you have to
12 complete it and the incentive for possible time off of your
13 sentence if you successfully complete it, so that you can be
14 returned to your family at the earliest possible time. While at
15 the same time letting society know that this Court will not
16 tolerate the type of conduct that you have engaged in.
17     Earlier this morning I sentenced Mr. Chance, who you
18 are intimately familiar with in a drug business. I am not
19 trying to imply anything else, but certainly in the
20 methamphetamine business you have been associated with
21 Mr. Chance for quite some time. He will be spending almost the
22 next 14 years in the penitentiary. He won't be at a place like
23 Marianna, he will be likely in a place like Atlanta. He won't
24 have the chance that you have got. How do I look his parents in
25 the eye and say I am being fair to him like I'm trying to be

35

1  fair to you?
2      With all of that said, and I freely admit that I have
3  probably said more than I would like to have said in explanation
4  to you, which I feel no inclination to do, but by having your
5  parents who obviously care very much for you here, what I don't
6  want to have happen is for there to be more Christy Silases and
7  Shannon Silases created in this world because of my mistake.
8  And the best way that I can rationalize that is to do what I am
9  just about to tell you that I am going to do.
10     With that finding as to the guideline level, criminal
11 history category and the recommended guideline range that I have
12 stated of 24 to 30 months, a fine range would be reduced to five
13 thousand dollars instead of six thousand as a minimum; is that
14 right?
15     PROBATION OFFICER: That's correct.
16     THE COURT: And the maximum would still be four million
17 dollars. Ms. James, do either you or your client have anything
18 to say in mitigation or otherwise before the Court pronounces
19 sentence in this case?
20     MS. JAMES: Judge, the only thing I would point out
21 since we haven't had an opportunity to speak informally with the
22 Court since Mr. Lancaster went to find that information, he did
23 indicate to me that in speaking with people at the Bureau of
24 Prisons that she would be considered eligible at 24 months but
25 there's still other factors that could influence whether or not

36

1  she gets into that program. And I think all of us are on the
2  same page that she does need to be on Adderal and drug rehab, so
3  I am hoping that the Court in fashioning the sentence will
4  consider that that is not a certainty even with the Court's
5  recommendation.
6      THE COURT: And I have taken that into consideration.
7  But -- I have taken that into consideration. Anything further?
8      MS. JAMES: No, sir.
9      THE COURT: Ms. Murphy, the sentence will now be stated
10 but you will have a final chance to make legal objections before
11 the sentence is imposed. Based upon the advisory guideline
12 range and the applicable statutory factors, it is the judgement
13 of this Court that you, Shannon Murphy, be committed to the
14 Federal Bureau of Prisons to be imprisoned for a total term of
15 24 months. The Court recommends that you be designated to a
16 facility where intensive residential substance abuse treatment
17 is available. And based upon the testimony that I have heard
18 from Doctor Koch, I would further recommend that the Bureau of
19 Prisons expedite your admission into a residential substance
20 abuse treatment program should you so qualify.
21     THE DEFENDANT: Yes, sir.
22     THE COURT: Based upon your inability to pay the Court
23 waives the imposition of a fine. However, you shall pay to the
24 United States District Court Clerk a special assessment fee of
25 one hundred dollars, which is due immediately. The Court finds

37

1    that there is no identifiable victim who incurred a financial
2    loss as a result of this offense.  Upon release from
3    imprisonment you shall be placed on supervised release for a
4    term of three years.  Within 72 hours of release from custody
5    you shall report to the probation office in the District to
6    which you are released.  While on supervised release you shall
7    comply with the mandatory and standard conditions of supervised
8    release on file with this Court.
9        The Court also orders the following special
10   conditions:  You shall participate in drug testing; you shall
11   contribute to the cost of any testing based upon your ability to
12   pay and the availability of third-party payments.  I am going to
13   expand that to also require that you participate in a drug
14   treatment program upon your release from imprisonment until you
15   are successfully discharged to the satisfaction of the probation
16   office.  Again, the cost of which program would be based upon
17   your ability to pay and the availability of third-party
18   payments.
19       You shall submit to a search of your person, residence,
20   office or vehicle pursuant to the search policy of this Court.
21   You shall cooperate in the collection of DNA.  The Court finds
22   that the sentence that has been stated is a reasonable sentence
23   in this case and is imposed to reflect the seriousness of the
24   offense and to promote respect for the law and provide just
25   punishment for the offense, to protect the public from any

38

1    further crimes of you, Ms. Murphy, and to provide you with the
2    needed educational or vocational training, medical care or other
3    correctional treatment in the most effective manner available to
4    this Court.  The Court further finds that any lesser sentence
5    would be insufficient to accomplish the purposes set forth in 18
6    United States Code Section 3553(a)(2).
7        The sentence that I am imposing, Ms. Murphy, is the
8    lowest sentence that I can give you that provides you with the
9    greatest benefit for returning to your family as soon, if not
10   sooner, than had I departed down and required that you serve
11   some amount of split sentence in a county facility.  I want you
12   to know that.  You may not appreciate that right now, but I am
13   confident in six months you will know exactly what I am talking
14   about.
15       You have got a real opportunity.  You are a young
16   person with a family that cares very much for you, a child, the
17   opportunity at vocational training, educational benefits while
18   you are going to be placed in whatever federal facility that you
19   would be placed.  I hope that you take advantage of those
20   programs and I hope that when you have paid your debt to society
21   that you can return home not only a better mother but a better
22   daughter and a productive member of society.  And I hope that
23   you and I never see each other under these circumstances.
24   Because if I do, I make this solemn promise to you, Ms. Murphy,
25   I will throw the book at you if you come back into this

39

1    courtroom.  And my time on this bench does not expire, barring
2    some impeachment proceedings, until December of 2023.  And it is
3    a lifetime appointment after that.  I have never made this
4    statement to another person, but I want you to understand that I
5    will be here to watch over you for as long as you are going to
6    be a middle-aged person.
7        THE DEFENDANT:  Yes, sir.
8        THE COURT:  Prove to me that you can succeed.  You have
9    got this opportunity whether you can appreciate it today or
10   not.  I hope to have impressed upon you the fact that I do care
11   about you, and I want you to succeed.
12       THE DEFENDANT:  Thank you.
13       THE COURT:  But don't come back here having failed.
14       THE DEFENDANT:  Yes, sir.
15       THE COURT:  If medication is going to help you overcome
16   this problem that you have, I want to give you the benefit of
17   getting in and out of the Federal Bureau of Prisons and I want
18   you to have the benefit of this Adderal that Doctor Koch has
19   talked about.
20       THE DEFENDANT:  Yes, sir.  Thank you.
21       THE COURT:  With all of that said, the sentence is
22   ordered imposed as stated and the Court will now address your
23   rights regarding appeal.  First of all, Ms. James, do you have
24   any objections to the sentence or to the manner in which the
25   Court pronounced it?  Do you have any objections to the Court's

40

1    ultimate findings of fact or conclusions of law?
2        MS. JAMES:  No, Your Honor.
3        THE COURT:  Any objections by the United States?
4        MR. MOORER:  No, Your Honor.
5        THE COURT:  Now covering your right of appeal,
6    Ms. Murphy.  You have a right to appeal.  In order for your
7    appeal to be timely you may need to file your notice of appeal
8    as soon as ten days after the Court enters its written judgment
9    in this case.  If you can not afford the cost of an appeal you
10   may petition this Court for leave to appeal in forma pauperis.
11   Pursuant to the plea agreement that you have reached with the
12   United States in this case you have waived some or all of your
13   rights regarding appeal.  Such waivers are generally enforceable
14   but if you believe that your waiver is not enforceable you may
15   present that theory to the appropriate appellate court.  I am
16   not encouraging you to appeal or not to appeal, Ms. Murphy, it's
17   my policy in every case to inform each Defendant of their right
18   regarding appeal.  Do you understand those rights?
19       THE DEFENDANT:  Yes, sir.
20       THE COURT:  Do you have any questions regarding your
21   rights of appeal?
22       THE DEFENDANT:  No, Your Honor.
23       THE COURT:  Ms. Murphy, I wish you the best of luck.
24   And before you are remanded to the custody of the United States
25   Marshal I would like for you and your counsel to approach.

41

1      (At which time a side-bar conference was had between

2   the Court and counsel, which conference was not attended by the

3   court reporter.)

4      MR. MOORER:  Your Honor, that concludes may cases, may

5   I be excused?

6      THE COURT:  You may.

7      (At which time, 12:40 p.m., the hearing was adjourned.)

8                   * * * * * * * * * *

9              COURT REPORTER'S CERTIFICATE

10     I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12       This 24th day of April, 2007.

13

14                  /s/ James R. Dickens
                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

✎AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

**MIDDLE**                   District of                   **ALABAMA**

UNITED STATES OF AMERICA          **JUDGMENT IN A CRIMINAL CASE**
V.
**SHANNON S. MURPHY**

|  |  |
|---|---|
| Case Number: | **2:06CR122-MEF** |
| USM Number: | **11947-002** |

**Susan G. James**
Defendant's Attorney

## THE DEFENDANT:

X  pleaded guilty to count(s)    **1 of the Indictment on 9/6/2006**

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:846 | Conspiracy to Distribute a Controlled Substance | 11/1/2005 | 1 |

    The defendant is sentenced as provided in pages 2 through    6    of this judgment. The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution,
the defendant must notify the court and United States attorney of material changes in economic circumstances.

**November 21, 2006**
Date of Imposition of Judgment

_Signature of Judge_

**MARK E. FULLER, CHIEF U.S. DISTRICT JUDGE**
Name and Title of Judge

1 December 2006
Date

**GOVERNMENT
EXHIBIT**

H

AO 245B    (Rev. 06/05) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___6___

DEFENDANT:      **SHANNON S. MURPHY**
CASE NUMBER:    **2:06CR122-MEF**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**Twenty four (24) months.**

X The court makes the following recommendations to the Bureau of Prisons:

**The Court recommends that defendant be designated to a facility where Intensive Residential Substance Abuse Treatment is available. The Court further recommends that defendant be expedited into this program.**

X The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐  at _____ ☐ a.m. ☐ p.m. on _____ .

   ☐  as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  before 2 p.m. on _____ .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:


Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.


                                        _____
                                            UNITED STATES MARSHAL

        By _____
                                  DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT:    **SHANNON S. MURPHY**
CASE NUMBER:    **2:06CR122-MEF**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

**Three (3) years.**

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

X    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

X    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3C — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:    **SHANNON S. MURPHY**
CASE NUMBER:    **2:06CR122-MEF**

## SPECIAL CONDITIONS OF SUPERVISION

**Defendant shall participate in drug testing and shall contribute to the cost of any testing based on ability to pay and availability of third party payments and require defendant to participate in drug treatment program after defendants release.**

**Defendant shall submit to a search of her person, residence, office or vehicle pursuant to the search policy of this Court.**

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
             Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 5 | of | 6 |

DEFENDANT:          **SHANNON S. MURPHY**
CASE NUMBER:        **2:06CR122-MEF**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | **$ 100.00** | **$ 0** | **$ 0** |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ 0 | $ _____ 0 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

   ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___6___ of ___6___

DEFENDANT:    **SHANNON S. MURPHY**
CASE NUMBER:    **2:06CR122-MEF**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**    X    Lump sum payment of $ __100.00__    due immediately, balance due

    ☐    not later than _____ , or
    X    in accordance    ☐ C,    ☐ D,    ☐    E, or    X    F below; or

**B**    ☐    Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

**C**    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**    ☐    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**    X    Special instructions regarding the payment of criminal monetary penalties:

    **Criminal monetary payments shall be made payable to the Clerk, U.S. District Court, Middle District of Alabama, P.O. Box 711, Montgomery, AL 36101.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.